**PUBLISHED**

UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

No. 16-1103

RONALD BARTON; NEIL KNOX; ELIJAH P. MORRIS; WAYNE MORRIS; JOHN TABOR, on behalf of himself and all other persons similarly situated; UNITED STEEL, PAPER AND FORESTRY, RUBBER, MANUFACTURING, ENERGY, ALLIED INDUSTRIAL & SERVICE WORKERS INTERNATIONAL UNION AFL-CIO/CLC,

Plaintiffs - Appellants,

v.

CONSTELLIUM ROLLED PRODUCTS-RAVENSWOOD, LLC; CONSTELLIUM ROLLED PRODUCTS-RAVENSWOOD, LLC EMPLOYEES GROUP BENEFITS PLAN,

Defendants - Appellees.

Appeal from the United States District Court for the Southern District of West Virginia, at Charleston. Joseph R. Goodwin, District Judge. (2:13-cv-03127)

Argued: January 24, 2017                    Decided: March 22, 2017

Before MOTZ, DUNCAN, and HARRIS, Circuit Judges.

Affirmed by published opinion. Judge Motz wrote the opinion, in which Judge Duncan and Judge Harris joined.

**ARGUED**: Joseph P. Stuligross, UNITED STEEL WORKERS OF AMERICA, Pittsburgh, Pennsylvania, for Appellants. Christopher Alan Weals, MORGAN, LEWIS

& BOCKIUS LLP, Washington, D.C., for Appellees. **ON BRIEF**: Pamina Ewing, McKean Evans, FEINSTEIN DOYLE PAYNE & KRAVEC, LLC, Pittsburgh, Pennsylvania, for Appellants. Charles C. Jackson, Chicago, Illinois, Sean K. McMahan, Abbey M. Glenn, MORGAN, LEWIS & BOCKIUS LLP, Washington, D.C., for Appellees.

_____

DIANA GRIBBON MOTZ, Circuit Judge:

A class of retirees and their union filed this action after their former employer unilaterally altered its retiree health benefits program. Because the governing collective bargaining agreement does not provide for vested retiree health benefits, we affirm the district court's grant of summary judgment to the employer.

I.

A.

Constellium Rolled Products-Ravenswood, LLC operates an aluminum plant in Ravenswood, West Virginia. The individual plaintiffs have retired from working in that plant. The United Steel, Paper and Forestry, Rubber, Manufacturing, Energy, Allied Industry & Service Workers International Union AFL-CIO/CLC ("the Union") represented the retirees during their employment. As far back as 1988, the Union negotiated collective bargaining agreements ("CBAs") with Constellium (or its predecessors) on the employees' behalf.

Each individual class member retired during the operation of one of seven CBAs between the Union and one of Constellium's predecessors. These included the 1988 CBA between the Union and Kaiser Aluminum & Chemical Corporation; the 1992 CBA between the Union and Ravenswood Aluminum Corporation of West Virginia, Inc.; the 1994 CBA between the Union and Ravenswood Aluminum; the 1999 CBA between the Union and Century Aluminum Corporation; the 2002 CBA between the Union and Pechiney Rolled Products; the 2005 CBA between the Union and Alcan Rolled Products-

3

Ravenswood; and the 2010 CBA between the Union and Alcan. The 2010 CBA expired on July 15, 2012.

Article 15 of each CBA, which appears in substantially the same form across all seven, contained a provision for group health insurance benefits. The 2010 provision reads as follows:

1. The group insurance benefits shall be set forth in booklets entitled Employees' Group Insurance Program and Retired Employees' Group Insurance Program, and such booklets are incorporated herein and made a part of the 2005 Labor Agreement by such reference.
2. It is understood that this agreement with respect to insurance benefits is an agreement on the basis of benefits and that the benefits shall become effective on July 15, 2010, except as otherwise provided in the applicable booklet, and further that such benefits shall remain in effect for the term of this 2010 Labor Agreement.

The "booklet[]" to which Article 15 refers, entitled "Retired Employees' Group Insurance Program," serves as the summary plan description ("SPD") of the group health insurance benefits program for retirees. The first edition of the SPD was issued in 1985, with subsequent editions issued in 1990, 1992, 1995, and 2005. The 2005 SPD provides that, with limited exceptions, "[t]he benefits described in this summary are effective as of June 1, 2005," the date of the start of the 2005 CBA, and that these benefits last "for the term of the Labor Agreement." Substantively identical language appeared in the previous editions of the SPD.

B.

In addition to the various editions of Article 15 of the CBA and the SPD, the Union and Constellium's predecessors agreed, in another set of documents, which the parties call "Cap Letters," to further parameters governing retiree health benefits. In

4

November 2002, one month before they signed the 2002 CBA, the Union and Pechiney reached agreement on how they would allocate health care spending for employees who retired on or after January 1, 2003. The parties agreed that Pechiney would annually contribute up to $32,068 for each pre-2003 retiree under the age of 65 and $3,912 for those pre-2003 retirees age 65 or over. The 2002 Cap Letter further provided that any costs above this cap "shall be allocated evenly to all participants in such group, as an annual individual contribution." Additionally, the 2002 Cap Letter mandated that the parties negotiate any cap on health benefits as part of subsequent collective bargaining negotiations. Finally, this Cap Letter delayed implementation of the cost-sharing requirement for post-2002 retirees until January 1, 2006, after the 2002 CBA's expiration date.

On August 2, 2005, roughly two months after the start of the 2005 CBA, the Union and Pechiney signed a second Cap Letter, which adjusted Pechiney's contribution level for post-2002 retirees. The 2005 Cap Letter took effect on January 1, 2011, after the 2005 CBA's expiration date. Finally, on July 15, 2010, the same day they signed the 2010 CBA, the Union and Alcan executed a third Cap Letter. This one kept the 2005 Cap Letter's employer contribution limit, again only for post-2002 retirees. Unlike the previous two Cap Letters, which took effect *after* the implementation of their concurrently-negotiated CBAs, the 2010 Cap Letter took effect on January 1, 2011, over eighteen months *before* the expiration of the 2010 CBA.

C.

In July 2012, during negotiations over a new CBA, Constellium proposed amending Article 15 to extend the cap on its contributions to retiree health benefits to employees who retired before January 1, 2003 and to freeze its Medicare Part B premium reimbursement amount for all hourly retirees at $99.90. The Union, asserting that the retiree health benefits had vested, refused to bargain on this issue. Constellium sent the Union a written notice that it planned to make these changes beginning January 1, 2013. When that day came, Constellium did so.

In February 2013, the individuals who retired during one of the above-mentioned CBAs and the Union (collectively "the Retirees") initiated this litigation against Constellium (and its pension plan). On March 3, 2014, the Retirees filed their First Amended Complaint, which contained both class and individual allegations. The class allegations were on behalf of two subclasses — pre-2003 retirees whom the extension of the contribution cap affected and hourly employees whom the Medicare premium contribution freeze affected — who alleged a violation of Section 301 of the Labor Management Relations Act, 29 U.S.C. § 185. The individual plaintiffs brought an additional claim for violation of Section 502(a)(1) of the Employee Retirement Income Security Act, 29 U.S.C. § 1132(a)(1)(B) ("ERISA"). All of these claims rested on the contention that the retiree health benefits had vested.

Following discovery, the parties filed cross-motions for summary judgment. The district court granted Constellium's motion and dismissed the case. *Barton v.*

6

*Constellium Rolled Prods.-Ravenswood, LLC*, No. 2:13-cv-03127, 2016 WL 51262 (S.D. W. Va. Jan. 4, 2016). The Retirees subsequently noted this timely appeal.

We review de novo the district court's grant of summary judgment. *Henry v. Purnell*, 652 F.3d 524, 531 (4th Cir. 2011) (en banc). Summary judgment is proper only if, viewing the evidence in the light most favorable to the non-moving party, there are no genuine disputes of material fact and the moving party demonstrates the right to judgment as a matter of law. *Id.*

## II.

The Retirees argue that the parties intended the Article 15 health benefits to vest, and so continue beyond the duration of the CBA. Accordingly, they contend, Constellium's unilateral alteration of those benefits breached its obligations under the CBA.

### A.

The Supreme Court has recently held courts must "interpret collective-bargaining agreements, including those establishing ERISA plans, according to ordinary principles of contract law, at least when those principles are not inconsistent with federal labor policy." *M&G Polymers USA, LLC v. Tackett*, 135 S. Ct. 926, 933 (2015). Thus, in *Tackett* the Court instructed "[w]here the words of a contract in writing are clear and unambiguous, its meaning is to be ascertained in accordance with its plainly expressed intent." *Id.* (quoting 11 R. Lord, *Williston on Contracts* § 30:6, at 108 (4th ed. 2012)).

*Tackett* involved review of a Sixth Circuit case that, in accord with prior circuit precedent, held for a class of plaintiff retirees. *See* 135 S. Ct. at 932. That prior circuit precedent, *International Union, United Automobile, Aerospace, & Agricultural Implement Workers of America v. Yard-Man, Inc.*, 716 F.2d 1476 (1983), directed courts to apply a presumption that, barring unambiguous evidence to the contrary, parties intended for benefits in a collective bargaining agreement to vest. *Id.* at 935. In *Tackett*, the Supreme Court "reject[ed] the *Yard-Man* inferences as inconsistent with ordinary principles of contract law." *Id.* at 937; *see also id.* at 935–37 (explaining *Yard-Man*'s incompatibility with general contract principles). It explained that *Yard-Man* clashed with "the traditional principle that 'contractual obligations will cease, in the ordinary course, upon termination of the bargaining agreement.'" *Id.* at 937 (quoting *Litton Fin. Printing Div., Litton Bus. Sys., Inc. v. NLRB*, 501 U.S. 190, 207 (1991)). Indeed, the Supreme Court in *Tackett* specifically mandated that "when a contract is silent as to the duration of retiree benefits, a court may not infer that the parties intended those benefits to vest for life." *Id.*

Thus, we must interpret Article 15 using ordinary contract principles. And in doing so, we must recognize that these principles foreclose holding that the retiree health benefits have vested unless unambiguous evidence indicates that the parties intended that outcome.

B.

Article 15 of the CBA states that the retiree health benefits "shall remain in effect for the term of this . . . Labor Agreement." Article 15 also provides that the parameters

8

of the retiree health benefits programs "shall be set forth in [the] booklet[] entitled . . . Retired Employees' Group Insurance Program." That booklet, which serves as the SPD for these benefits, similarly states that these benefits would last "for the term of the Labor Agreement." It is undisputed that the term of the 2010 CBA, the most recent one relevant, ended in 2012.[1]

The plain language of the CBA and SPD clearly indicates that the retiree health benefits did *not* vest. First, Article 15 contains explicit durational language stating that the retiree health benefits continue "for the term of" the governing CBA. Furthermore, the SPD echoes this language, reiterating the benefits continue "for the term of the" CBA.

The contrast between the durational language in the retiree health benefits SPDs and the more expansive language found in the pension benefits SPDs bolsters this conclusion. With respect to pension benefits, the SPDs have generally provided that "once pension payments commence they are payable monthly *for the life of the participant*," and are "not subject to reduction." The use of this unambiguous language in one section of an agreement indicates that the parties knew how to manifest their intent to vest certain benefits. The absence of such language in another section in the same agreement thus evidences an absence of such intent. *See Trumball Invs. Ltd. I v. Wachovia Bank, N.A.*, 436 F.3d 443, 447–48 (4th Cir. 2006). The contrast between the

---

[1] The 2005 SPD adds an additional sentence to its description of the benefits, stating that "[n]o benefit described in this booklet is vested." The Retirees contend that Constellium unilaterally promulgated this language, rendering it irrelevant in determining the mutual intent of the parties. Because we need not rely on this sentence in order to affirm, we do not address this argument.

retiree health benefits and pension plan SPD provisions demonstrates this point. *See*

*Dewhurst v. Century Aluminum Co.*, 649 F.3d 287, 289, 291–93 (4th Cir. 2011).

The Retirees cannot overcome the clear language of Article 15 of the CBA and the

SPD. Given this language, the Retirees cannot demonstrate that their health benefits had

vested.

III.

The Retirees resist this contention, asserting that it improperly reads a single

phrase in isolation. *See Quesenberry v. Volvo Trucks N. Am. Retiree Healthcare Benefit*

*Plan*, 651 F.3d 437, 440 (4th Cir. 2011). They assert that the Cap Letters and other

provisions of the CBA evince an intent to vest the retiree health benefits. *See id.*

(rejecting an employer's argument that "one phrase in this particular collective

bargaining agreement conclusively resolves" whether the benefits vested because other

parts of CBA were incompatible with this conclusion). [2]

---

[2] The Retirees also argue that extrinsic evidence, including past conduct by Constellium and its predecessors, demonstrates that the parties intended the benefits to vest. Because, as explained above, we find that the language of the CBA and SPD unambiguously forecloses this interpretation, we do not address the extrinsic evidence. *See Williston on Contracts* § 55:23 (noting a "general agreement among most courts that parol evidence of the parties' bargaining history may be used to explain or supplement the terms of the collective bargaining agreement, but may not be admitted to prove an agreement at variance with the normal or customary meaning of the words chosen by the parties to express their agreement").

## A.

## 1.

We begin with the Cap Letters. The 2002 and 2005 Cap Letters set limits on employer contributions to commence after the expiration of the CBA under concurrent negotiation. The Retirees argue that this structure only makes sense if, notwithstanding the language in Article 15 of the CBA and the SPD, the parties intended for the retiree health benefits to continue beyond the termination of the CBA.

The Cap Letters themselves undermine the notion that the retiree health benefits vested, for the Cap Letters indicate that the parties can *change* the benefits. For example, the 2005 Cap Letter, by significantly reducing the employer contribution on behalf of post-*2002* retirees, effectively reduced the benefits for individuals who had already retired between 2003 and 2005 from what the 2002 Cap Letter had provided them. And the Cap Letters' instruction that they are "a mandatory subject of collective bargaining in any subsequent contract negotiations" underscores that the Retirees' health benefits are fluid and not set in stone.

Additionally, the 2010 Cap Letter memorializes the parties' agreement to start capping retiree benefits before the expiration of the CBA that the parties were then negotiating. The Retirees would have us infer that the post-termination start dates of the 2002 and 2005 Cap Letters show an intention to continue the retiree health benefits after the termination of the CBA. But despite no substantive change to Article 15 in the 2002, 2005, and 2010 CBAs, the parties did not give the 2010 Cap Letter a start date after the

11

termination of the 2010 CBA. This strongly suggests that the parties did not seek to manifest through the Cap Letters any latent intent to vest the retiree health benefits.

Given that Article 15 and the SPD maintain nearly identical durational language across all seven CBAs, we see no reason to treat employees who retired between 2003 and 2010 differently from the rest based on the Cap Letters. The Cap Letters both fall far short of *Tackett*'s requirement for a clear signal that parties intend for benefits to vest and fail to negate the unambiguous durational language in Article 15 and the SPD cutting against vesting. Accordingly, we cannot draw the inference the Retirees suggest.

2.

To buttress their contention about the Cap Letters, the Retirees rely on *Quesenberry* and *Keffer v. H.K. Porter Co.*, 872 F.2d 60 (4th Cir. 1989). Both cases predate the Supreme Court's 2015 directive in *Tackett* that "when a contract is silent as to the duration of retiree benefits, a court may not infer that the parties intended those benefits to vest for life." 135 S. Ct. at 937. Moreover, the contracts in both cases differ markedly from the one at issue here.

In *Keffer*, we held that the retirement benefits in question vested, thus outlasting the CBA's expiration, because the CBA provided that retirees' benefits would terminate when they became eligible for Medicare. 872 F.2d at 62–63. We concluded that this language illustrated the parties' understanding that the retirees' benefits would survive the CBA. *Id.* at 64. As we recognized in *Dewhurst*, "the collective bargaining agreement in *Keffer* differed materially from" Article 15 because "[i]n *Keffer*, retiree health benefits

12

were explicitly linked not to termination of the agreement, but to a post-termination event, namely the date of the retiree's eligibility for Medicare." 649 F.3d at 292.

*Quesenberry* offers a stronger, although ultimately unpersuasive, argument for the Retirees. The CBA at issue there established a trust fund to cover cost overruns in retiree health benefits and obligated the employer to make a contribution to that trust fund on the day the CBA terminated. 651 F.3d at 438–39. That provision also set forth a mechanism to address cost overruns beyond what the trust fund could support; it allowed the employer to charge retirees for excess costs, but only after the parties negotiated over steps to reduce overall health costs. *Id.* at 439. Relying on the cost overrun provision, we held that the employer breached the CBA by terminating health benefits. *Id.* at 440–42. We explained that the cost overrun provision "makes no sense unless it operates as a limitation on [the employer's] right to modify benefits beyond the term of the agreement." *Id.* at 440. Because "the negotiated mechanism . . . is meaningless if it does not extend past the expiration of the CBA," we refused to read the coverage provision's durational language as relieving the employer of its duty to comply with the cost overrun provision. *Id.* at 441.

In contrast to *Keffer*, and unlike in *Quesenberry*, here we have very strong evidence that the retiree health benefits continue only as long as the CBA. First, the plain language of the CBA and SPD so provides. Second, the disjunction between the pension plan and the retired employees' health benefits SPD provisions strongly indicates that the parties did not intend the latter to vest. Additionally, the Cap Letters do not have the same infeasibility problem as the trust fund in *Quesenberry*. The 2010 Cap Letter

13

superseded the 2005 Cap Letter before the 2005 contribution provision came into effect and set the new implementation date to before the 2010 CBA expired. The most reasonable inference from the various effective dates is that the post-termination start dates of the 2002 and 2005 Cap Letters were precautionary cost-containment measures in the event the parties had not agreed to a new CBA before the expiration of the prior one, but wanted to avoid a sudden cancellation of the retirees' health benefits. The flexibility to adjust the date and level of the cap and the stop-gap role the Cap Letters potentially fill contrast strongly with *Quesenberry*, where adherence to the durational language would effectively nullify a meticulous, detailed, and prominent part of that CBA.

If the CBA did not have the durational language of Article 15, the Cap Letters would certainly not eliminate an inference that the parties intended the benefits to continue past *that* CBA. But given Article 15's *actual* robust durational language, the other textual provisions which cut against this inference, and *Tackett*'s call for clarity in providing for vesting, the Cap Letters do not show that the parties intended the benefits to vest.

B.

Nor do the Retirees' arguments related to other provisions persuade us. The Retirees specifically point to language in the SPD regarding coverage for retirees'

14

dependents and pensioned surviving spouses and the reimbursement of Medicare Part B premiums. These provisions, they say, indicate that the retiree health benefits vested.[3]

We start with the provision for dependent coverage. The CBA offered such coverage, and all SPDs provided, in nearly identical language, that such coverage "shall cancel on the date such person is no longer an eligible dependent as defined *or upon your death*, whichever comes first." The Retirees argue that the decision to link the termination of the dependent coverage benefits to a retiree's death evinces an intent for the retiree health benefits to vest.

Given the unequivocal durational language, we cannot agree. One can reconcile the dependent coverage provision with the durational language by reading the former to terminate benefits for a retiree's dependents at the time of the retiree's death, while the benefits for dependents of surviving retirees terminate at the end of the CBA. This reading seems the likelier manifestation of the parties' intent, both because it harmonizes the purportedly conflicting provisions and because the dependent coverage sections of the SPD contain nothing explicit about vesting.

The pensioned surviving spouses SPD provision similarly offers the Retirees little help. Each edition of the SPD made clear that the pensioned surviving spouse of a retiree is eligible to receive the benefits that would have gone to the retiree had he lived. This language simply defines a category of people *eligible* to receive benefits; it says nothing

_____

[3] The Retirees also argue that in 1979, the parties replaced a six-month limitation on dependent coverage with a promise of lifetime benefits, and that this supports their interpretation of the CBA. Because they never raised this argument below, they have waived it. *See Pornomo v. United States*, 814 F.3d 681, 686 (4th Cir. 2016).

15

about the *duration* for which those benefits will last. This language cannot surmount the durational language of Article 15 and the SPD, especially when compared to the ironclad evidence of vesting that the language for the pension plan provides.

Finally, we also find unpersuasive the Retirees' efforts to invoke Constellium's agreement to reimburse Medicare Part B premiums as evidence that the parties intended the benefits to vest. The SPD provides that when a retiree or pensioned surviving spouse age 65 or older "enrolls in Medicare Part B, [Constellium] will reimburse such [individual] for the actual monthly cost for Medicare coverage . . . *for the duration of the Labor Agreement*." The emphasized clause, combined with language in the following paragraph that this benefit lasts only while the individual is on Medicare Part B and "*is entitled to benefits under this Plan*," clearly shows a temporal limitation on this benefit, defeating the Retirees' argument.

IV.

For the foregoing reasons, the judgment of the district court is

*AFFIRMED*.

16