RECOMMENDED FOR FULL-TEXT PUBLICATION
Pursuant to Sixth Circuit I.O.P. 32.1(b)
File Name: 17a0090p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

───────────────

ROBERT COLE, JOHN ADAMS, RICHARD S. LANTER (03-73872) and LOIS E. LAST, DAVID REAMER, CHARLES A. SCHMIDT (04-73656), on behalf of themselves and a similarly situated class; INTERNATIONAL UNION, UNITED AUTOMOBILE, AEROSPACE AND AGRICULTURAL IMPLEMENT WORKERS OF AMERICA,

*Plaintiffs-Appellees*,

*v.*

MERITOR, INC., fka ArvinMeritor, Inc.; ROCKWELL AUTOMATION, INC.; ROCKWELL INTERNATIONAL CORPORATION;

*Defendants-Appellants.*

> No. 06-2224

Appeal from the United States District Court
for the Eastern District of Michigan at Detroit.
Nos. 03-73872; 04-73656—Nancy G. Edmunds, District Judge.

Argued: October 18, 2016

Decided and Filed: April 20, 2017

Before: SUHRHEINRICH, GILMAN, and WHITE, Circuit Judges.

───────────────

## COUNSEL

**REARGUED:** Bobby R. Burchfield, KING & SPALDING LLP, Washington, D.C., for Appellants. Stuart M. Israel, LEGGHIO & ISRAEL, P.C., Royal Oak, Michigan, for Appellees. **ON PETITION FOR REHEARING AND SUGGESTION FOR REHEARING EN BANC:** Bobby R. Burchfield, KING & SPALDING LLP, Washington, D.C., for Appellants. **ON RESPONSE:** Stuart M. Israel, LEGGHIO & ISRAEL, P.C., Royal Oak, Michigan, for Appellees.

GILMAN, J., delivered the superseding opinion of court in which SUHRHEINRICH and WHITE, JJ., joined.  WHITE, J. (pg. 12), delivered a separate concurring opinion.

––––––––––––––––––––––––––––

**SUPERSEDING OPINION**

––––––––––––––––––––––––––––

RONALD LEE GILMAN, Circuit Judge.   The key issue in this case is whether the retired employees of Meritor, Inc. and Meritor's predecessors have a vested right to lifetime healthcare benefits.  In this court's prior decision in *Cole v. ArvinMeritor, Inc.*, 549 F.3d 1064 (6th Cir. 2008), we held that the retirees have such a right.  Our decision was controlled by this court's earlier cases of *UAW v. Yard-Man, Inc.*, 716 F.2d 1476 (6th Cir. 1983), *Yolton v. El Paso Tenn. Pipeline Co.*, 435 F.3d 571 (6th Cir. 2006), and *Noe v. PolyOne Corp.*, 520 F.3d 548 (6th Cir. 2008).

Meritor filed a timely petition to rehear.  The petition was held in abeyance for eight years while the parties attempted to settle their dispute, initially on their own and later under the auspices of this court's Mediation Office.  When we were informed in July 2016 that a final impasse had been reached, Meritor's petition to rehear was placed back on the docket for consideration.

In the intervening eight years, a sea change in the applicable law has occurred.  The Supreme Court abrogated the *Yard-Man* line of cases in *M & G Polymers USA, LLC v. Tackett*, 135 S. Ct. 926 (2015), and this court in *Gallo v. Moen Inc.*, 813 F.3d 265 (6th Cir.), *cert. denied*, __U.S.__ (Oct. 31, 2016), held that a series of collective bargaining agreements (CBAs) materially indistinguishable from those involved here did not provide the retirees with lifetime healthcare benefits.

This case is now controlled by *Tackett* and *Gallo*.  We therefore **GRANT** Meritor's petition to rehear, **REVERSE** the judgment of the district court, and **REMAND** the case for any further proceedings that might be necessary.

## I.  BACKGROUND

**A.**     **Factual background**

Rockwell Automation, Inc., a diversified manufacturer that supplied parts to the automotive industry, owned industrial plants throughout the United States.  In 1997, Rockwell spun off its automotive division, which eventually became Meritor, Inc.  Meritor manufactures automotive integration systems, modules, and components for manufacturers of passenger vehicles, commercial trucks, and trailers.  Between the late 1970s and 2003, either Rockwell or Meritor closed the twelve plants at issue in this litigation, which were located in Illinois, Indiana, Kentucky, Michigan, Ohio, and Wisconsin.

All of the hourly employees at the closed plants were represented by the United Automobile, Aerospace, and Agricultural Implement Workers of America (the UAW).  Rockwell/Meritor and the UAW have engaged in collective bargaining for decades, producing a succession of CBAs.  The CBAs typically covered a three-year period and followed a consistent format, including a master agreement (the National Agreement) and several supplemental agreements addressing different topics that were expressly incorporated into the National Agreement.  For example, the Supplemental Insurance Agreement (always Exhibit B) and its accompanying Insurance Program (always Exhibit B-1) addressed the health insurance coverage at issue in this case.  Company-paid retiree healthcare benefits were established in 1962, with Rockwell paying half the cost.  In the 1965 CBA, Rockwell agreed to pay the full cost of retiree healthcare benefits.

The benefits language at issue in this case first appeared in the 1968 CBA and continued through to the 2000 CBA.  Over those years, the benefits changed in modest ways, but the core language regarding retiree healthcare coverage remained essentially unchanged.  *See Cole v. ArvinMeritor, Inc.* (*Cole II*), 515 F. Supp. 2d 791, 795 (E.D. Mich. 2006).  Then, in 2003, Meritor unilaterally eliminated dental, vision, and hearing-aid coverages for the retirees.  It also increased the deductibles, copays, and out-of-pocket maximums.  Finally, Meritor announced plans in 2005 to eliminate all healthcare benefits as of the next year for the retirees, their eligible dependents, and their surviving spouses.

**B.      Procedural background**

In 2003, the UAW and a class of retirees brought suit against Meritor and Rockwell in the United States District Court for the Eastern District of Michigan.  They asserted claims under § 301 of the Labor Management Relations Act, 29 U.S.C. § 185, and § 501(a)(1)(B) of the Employee Retirement Income Security Act (ERISA), 29 U.S.C. § 1132(a)(1)(B).  The lawsuit was based on Meritor's unilateral reduction of benefits and the increase in out-of-pocket expenses for the retirees in 2003.  In September 2004, the UAW, along with another class of retirees, filed a substantially identical lawsuit in the Eastern District of Michigan.  The cases were eventually consolidated, with the district court certifying a class of approximately 2,900 UAW-represented retirees (along with eligible dependents and surviving spouses), who currently or formerly received retiree healthcare benefits from Meritor.

While the lawsuit was proceeding, Meritor made the 2005 announcement mentioned above that would have eliminated all healthcare benefits for the affected groups.  This caused the plaintiffs to file a motion for a preliminary injunction to force Meritor to continue providing those benefits.  After an evidentiary hearing, the district court granted the preliminary injunction. *Cole v. ArvinMeritor, Inc*. (*Cole I*), 516 F. Supp. 2d 850, 880 (E.D. Mich. 2005).  The court found that "the contracting parties' intention to provide lifetime retiree health coverage" was expressed in the "explicit language" of the CBAs and confirmed by prior precedent and a multitude of extrinsic evidence. *Id.* at 865–67.

Following the entry of the preliminary injunction, each side moved for summary judgment, with Meritor essentially repeating the arguments that it had made at the preliminary-injunction stage.  The district court granted the plaintiffs' motion, denied Meritor's motion, and permanently enjoined Meritor from altering or canceling retiree healthcare benefits. *Cole II*, 515 F. Supp. 2d at 794.  This timely appeal followed.

## II. ANALYSIS

**A.      Applicable law**

CBA's typically create both pension and welfare-benefit plans. *M & G Polymers USA, LLC v. Tackett*, 135 S. Ct. 926, 933 (2015).  Although ERISA imposes "elaborate

minimum funding and vesting standards for pension plans," welfare benefits are excepted from those rules. *Id.* Welfare-benefit plans, including retiree healthcare, must instead be "established and maintained pursuant to a written instrument." *Id.* To determine whether welfare benefits are vested, we must interpret the relevant CBA according to the "ordinary principles of contract law, at least when those principles are not inconsistent with federal labor policy." *Id.*

Prior to the Supreme Court's decision in *Tackett*, this circuit interpreted CBA healthcare provisions under the guiding principles established in *Yard-Man*. The *Yard-Man* court held that "when the parties contract for benefits which accrue upon achievement of retiree status, there is an inference that the parties likely intended those benefits to continue as long as the beneficiary remains a retiree." *Yard-Man*, 716 F.2d at 1482. Although this *Yard-Man* inference was purportedly based on the basic rules of contract interpretation, its application over the years resulted in a de facto presumption in favor of vesting. *See Cole*, 549 F.3d at 1074. In our prior decision in this case, we in effect applied this presumption to find that the Meritor retirees were entitled to lifetime healthcare benefits.

*Yard-Man* was abrogated by the Supreme Court in 2015. The Court in *Tackett* held that "*Yard-Man* violates ordinary contract principles by placing a thumb on the scale in favor of vested retiree benefits in all collective-bargaining agreements." *Tackett*, 135 S. Ct. at 935. It concluded that the so-called *Yard-Man* inference distorted the attempt to ascertain the intent of the parties, which, "as with any other contract, . . . control[s]." *Id.* at 933 (quoting *Stolt-Nielsen S.A. v. AnimalFeeds Int'l Corp.*, 559 U.S. 662, 682 (2010)).

In applying the *Yard-Man* inference, this court was also faulted for failing to consider several traditional contractual principles, such as the rule that "contractual obligations will cease, in the ordinary course, upon termination of the bargaining agreement." *Id.* at 937 (citing *Litton Fin. Printing Div., Litton Business Systems, Inc. v. NLRB*, 501 U.S. 190, 207 (1991)). Furthermore, the *Tackett* Court cautioned that "when a contract is silent as to the duration of retiree benefits, a court may not infer that the parties intended those benefits to vest for life." *Id.* at 937.

The Supreme Court ultimately remanded *Tackett* to this court with instructions to apply these ordinary contract principles. In *Tackett v. M & G Polymers USA, LLC*, 811 F.3d 204 (6th Cir. 2016) (*Tackett III*), several additional contract principles were discussed, such as the rule that "when the contract is ambiguous, a court may consider extrinsic evidence to determine the intentions of the parties." *Id.* at 208–09. But this court in *Tackett III* did not resolve the merits of the case, instead sending it back to the district court to interpret the relevant CBA in the first instance using the ordinary principles of contract law.

In *Gallo*, this court for the first time interpreted a specific CBA according to the contract principles espoused in *Tackett* and *Tackett III*. The ordinary principles of contract law were applied to conclude that the CBA before the court was unambiguous in not vesting retiree healthcare benefits for life. *Gallo*, 813 F.3d at 273–74. Because the facts of *Gallo* are materially indistinguishable from the facts before us, we reach the same conclusion in this case.

**B.     Key terms of the CBAs**

The language relevant to the retirees' claim of lifetime healthcare benefits first appeared in the 1968 CBA. Although a new CBA was renegotiated every three years, the applicable language remained unchanged. We will therefore include the numbering and sections from the 1968 CBA, as we did in our prior decision.

According to the UAW, the language in Exhibit B to the 1968 CBA promised the retirees healthcare benefits for life. The UAW specifically points to Section 5 of Exhibit B, titled "Continuance of Healthcare Coverages Upon Retirement or Termination of Employment at 65 or Older." Section 5(a) provides as follows:

> The Health Care . . . Coverages an employee has under this Article at the time of retirement or termination of employment at age 65 or older . . . **shall be continued thereafter** provided that suitable arrangements can be made with the Carrier(s). Contributions for coverages so continued shall be in accordance with Article I, Section 3(b)(6).

(Emphasis added).

Meritor, on the other hand, argues that these healthcare benefits are limited by Exhibit B's durational clause. The relevant language, contained in Section 8 of Exhibit B to the 1968 CBA, reads as follows:

> This [Insurance] Agreement and [Insurance] Program as modified and supplemented by the [Insurance] Agreement shall continue in effect until the termination of the Collective Bargaining Agreement of which this is a part.

The district court held that the "shall be continued thereafter" language unambiguously promised retirees healthcare benefits for life and that the durational clause in Section 8 did not alter this conclusion. Section 8, the court explained, was just a general durational clause that could not trump contractual promises of lifetime benefits. *Cole II*, 515 F. Supp. 2d at 802. We affirmed, citing this circuit's then-binding precedent in *Yolton* for the proposition that "[g]eneral durational provisions only refer to the length of the CBAs and not the period of time contemplated for retiree benefits. Absent specific durational language referring to retiree benefits themselves, courts have held that the general durational language says nothing about those retiree benefits." *Cole*, 549 F.3d at 1071 (quoting *Yolton*, 435 F.3d at 580-81). In addition, the *Yolton* reasoning had been applied to durational clauses that "referred even more specifically to healthcare benefits than does [Section] 8." *Id.* at 1073. This court was therefore bound by precedent to conclude that Section 8 did not limit the duration of the retirees' healthcare benefits. *Id.* at 1073–74.

Because of the intervening decisions in *Tackett* and *Gallo*, the district court's conclusions are no longer sustainable. The reasoning espoused in *Yard-Man*, *Yolton*, and *Noe* has been abrogated by the Supreme Court. Instead, we must apply ordinary contract principles as instructed by *Tackett* and as applied in *Gallo*.

*Gallo* is legally indistinguishable from the present case. The *Gallo* court faced an identical issue: whether a series of CBAs entitled a class of retirees to lifetime healthcare benefits. *Gallo*'s CBA contained terms stating that healthcare benefits for retirees "will be provided," "will be covered," and would "[c]ontinue." *Id.* at 269. These provisions were determined not to be specific enough to override the CBA's general durational clause and,

therefore, the healthcare benefits did not vest for life.  *Id.*  The *Gallo* court held that "[a]bsent a longer time limit in the context of a specific provision, the general durational clause supplies a final phrase to every term in the CBA."  *Id.*  In making that determination, this court did not look "beyond the contract's four corners" and ruled that, because the contract was unambiguous, the consideration of extrinsic evidence was inappropriate.  *Id.* at 273–74.

In this case, the 1968 CBA and every subsequent CBA provided that retiree healthcare benefits "shall be continued."  There is no language in Exhibit B to the 1968 CBA that provides a specific expiration date for those benefits.  All of the CBAs, however, included a general durational clause that terminated the agreement after three years.  *See, e.g.*, Article XVIII, 1968 CBA; Article XIX of the 2000 CBA.  In addition, Exhibit B to each CBA had its own durational clause, identical in wording to that previously quoted from Section 8 of the 1968 CBA, that explicitly tied healthcare benefits to the continuing existence of the CBA in question.

The "shall be continued" language in Exhibit B is thus not sufficient to vest the retirees with healthcare benefits for life.  As stated in *Gallo*, "[i]f *Tackett* tells us anything, . . . it is that the use of the future tense without more—without words committing to retain the benefit for life—does not guarantee lifetime benefits."  *Id.* at 271.  Like the CBAs at issue in *Gallo*, the CBAs between the UAW and Meritor made commitments for "approximately three-year terms— well short of commitments for life."  *Id* at 269.

The CBAs also contained durational clauses that supplied a concrete date of expiration for retiree healthcare benefits.  These durational clauses give meaning to the promise that healthcare benefits "shall be continued."  That is, Meritor guaranteed healthcare benefits only until the expiration of the final CBA, nothing more.  *See id.*  This result is in line with the ordinary principles of contract law, which dictate that "contractual obligations will cease, in the ordinary course, upon termination of the bargaining agreement."  *Id.* at 279 (quoting *Tackett*, 135 S. Ct. at 937).

Despite the foregoing analysis, the plaintiffs argue that the promise of lifetime retiree healthcare benefits is confirmed by the "contractual context."  It points to two examples:  the

provision of certain healthcare benefits for specific durational periods of less than life and a section of the 2000 CBA that detailed future premium increases for medical care. Neither of these arguments, however, alters the conclusion that the CBAs are unambiguous in not vesting retiree healthcare benefits for life.

With regard to the first example, the plaintiffs point out that the CBAs "set specific durational limits on continued healthcare for employees on layoff and leave—up to 24 months— but set no duration limits on retiree healthcare." *See* 2000-2003 CBA, p. 68. This absence of specific limits on retiree healthcare, the argument goes, shows that the parties intended the benefits to vest for life. But *Gallo* addressed and rejected a similar argument. Noting that specific and general contractual terms usually work in tandem, the *Gallo* court held that "[t]he CBAs' general durational clauses provide a baseline or default rule, a point at which the agreements expire absent more specific limits relevant to a particular term. In the absence of specific language in the retiree healthcare provisions, the general durational clause controls." *Id.* at 271–72 (emphasis in original). The same logic applies here.

Along those same lines, the CBAs also provided that pension benefits would last for the life of each retiree. For example, the 1991 CBA defined the basic benefit provided by the pension plan as "[t]he monthly benefit payable under the Plan for the lifetime of a retired or separated Employee[.]" The provision of pension benefits for life, however, actually supports the conclusion that retiree healthcare benefits were not intended to extend for the lifetime of the retirees. That is, we must "assume that the explicit guarantee of lifetime benefits in some provisions and not others means something." *Id.* at 270. Meritor and the UAW could have negotiated similar lifetime provisions when negotiating healthcare benefits. Instead, they simply provided that these benefits "shall be continued." This "difference in language demands a difference in meaning." *Id.* The difference has to be that the healthcare benefits were meant to continue for some period less than the lifetime of the retirees.

The plaintiffs second "contractual context" example that purportedly supports their argument is based on the 2000 CBA's provisions requiring those "retiring on and after October 1, 2002" to "share future premium increases." These "retiree medical cost caps" provided "for cost-sharing of premium increases above a formula-based threshold, with a downward

adjustment or freeze first when a retiree 'reaches Medicare eligibility' (i.e., age 65), and later when the retiree 'reaches age 80.'" *Cole I*, 516 F. Supp. 2d at 870. In addition, the 2000 CBA included a "hypothetical example" showing how the caps would apply to a worker retiring "on 1/1/2003 at age 55." The hypothetical example goes on to describe how the caps would operate when the worker reached age 80 in 2028, 25 years after the final CBA's expiration. Because the caps were future-oriented, the district court determined that "[t]he only reasonable conclusion is that the agreements intend[ed] that both pension and retiree health benefits [were] to continue for the lifetimes of retirees, eligible dependents, and surviving spouses." *Id.*

We respectfully disagree. To be sure, the caps section of the 2000 CBA indicates that the parties contemplated that retiree healthcare benefits would continue. But the continuation of retiree healthcare would have been consistent with every CBA renewal since 1968. Both parties understandably anticipated that these caps would come into play based on this history of renewal. But the fact that they anticipated, or even hoped, that these benefits would continue does not mean that Meritor is bound to provide these benefits for the life of the retirees.

*Gallo* instead tells us that, although the parties "may have wished that business conditions and stable healthcare costs (hope springs eternal) would permit it to provide similar healthcare benefits to retirees throughout retirement[,] . . . the question is whether the two parties signed a contract to that effect." *Gallo*, 813 F.3d at 269. Meritor and the UAW signed no such contract. To the contrary, the durational clause in Exhibit B to the 2000 CBA is unambiguous in not vesting retiree healthcare benefits for life.

Because the language of the 2000 CBA is unambiguous, "no basis for going beyond the contract's four corners exists." *Id.* at 274. Legally, that is the end of the matter. Yet one can understandably be puzzled by the apparent discrepancy between the extrinsic evidence that assured the retirees of lifetime healthcare benefits and our conclusion that the 2000 CBA is unambiguous in not providing such vesting. We believe that the answer to this puzzle lies in the fact that retiree healthcare benefits were a feature in every CBA between the parties since 1968. The parties, in other words, simply assumed that the benefits would continue for life because neither side anticipated the upheaval in the automotive industry or had any reason to think that any future CBA would alter the pattern of the past several decades. This likely led to "loose

talk" about lifetime healthcare benefits, with no one feeling the need to articulate the implied caveat that these benefits, like all employee benefits not explicitly vested for life, were dependent on the existence of a current CBA between Meritor and the UAW.

In any event, "[t]he first and best way to divine the intent of the parties is from the four corners of their contract and from traditional canons of contract interpretation." *Id.* at 273. The language in the 2000 CBA, as interpreted by the ordinary principles of contract law, is unambiguous in not vesting retiree healthcare benefits for life. To rule otherwise would be inconsistent with *Gallo*, which reached the same conclusion based on a materially indistinguishable series of CBAs. *See Salmi v. Sec'y of Health & Human Servs.*, 774 F.2d 685, 689 (6th Cir. 1985) (holding that "[a] panel of this Court cannot overrule the decision of another panel. The prior decision remains controlling authority unless an inconsistent decision of the United States Supreme Court requires modification of the decision or this Court sitting en banc overrules the prior decision.").

## III.  CONCLUSION

For all of the reasons set forth above, we **GRANT** Meritor's petition to rehear, **REVERSE** the judgment of the district court, and **REMAND** the case for any further proceedings that might be necessary.

---

**CONCURRENCE**

---

HELENE N. WHITE, Circuit Judge, concurring.  I reluctantly concur.  *Yard-Man* is dead.  Its demise should have heralded a return to general rules of contract interpretation.  Instead, the cry "The king is dead, long live the king!" echoes in the aftermath.  *Gallo v. Moen*, 813 F.3d 265 (6th Cir. 2016), has installed duration clauses as the new absolute determiner of intent, regardless of the actual intent of the parties.  I do not agree with *Gallo*, and would have found the CBA in that case ambiguous and its interpretation subject to parol evidence.  However, there is no question that if the CBA in *Gallo* unambiguously provided for the termination of health-care benefits upon the termination of the CBA, the instant agreement does so as well, given that the duration clause in Section 8 of the instant agreement is more specific than the clause in *Gallo*.