RECOMMENDED FOR FULL-TEXT PUBLICATION
Pursuant to Sixth Circuit I.O.P. 32.1(b)

File Name: 17a0253p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

———————

ANN WATKINS;  JAMES ULICNY, for themselves and
others similarly-situated,

        *Plaintiffs-Appellants*,

        *v.*

HONEYWELL INTERNATIONAL INC.,

        *Defendant-Appellee*.

No. 17-3032

———————

Appeal from the United States District Court
for the Northern District of Ohio at Toledo.
No. 3:16-cv-01925—James G. Carr, District Judge.

Argued:  October 10, 2017

Decided and Filed:  November 8, 2017

Before:  COLE, Chief Judge; ROGERS and GRIFFIN, Circuit Judges.

———————

## COUNSEL

**ARGUED:**  William Wertheimer, LAW OFFICE OF WILLIAM WERTHEIMER, Bingham
Farms, Michigan, for Appellants.  K. Winn Allen, KIRKLAND & ELLIS LLP, Washington,
D.C., for Appellee.  **ON BRIEF:**  William Wertheimer, LAW OFFICE OF WILLIAM
WERTHEIMER, Bingham Farms, Michigan, Stuart M. Israel, John G. Adam, LEGGHIO
& ISRAEL, P.C., for Appellants.  K. Winn Allen, Craig S. Primis, P.C., Matthew P. Downer,
KIRKLAND & ELLIS LLP, Washington, D.C., for Appellee.

———————

## OPINION

———————

COLE, Chief Judge.  This is a too-familiar story.  For almost 40 years, Honeywell
International (or its predecessors) operated a manufacturing plant in Fostoria, Ohio.  Many union

workers, including Ann Watkins and James Ulicny, spent most of their working years at the plant. They retired at a time when Honeywell promised in a collective-bargaining agreement that it would pay for their health insurance. But Honeywell's plans for Fostoria changed. When the final agreement expired in 2011, Honeywell did not renew it. It sold the plant and, later, stopped paying for its retirees' healthcare. Those retirees, no doubt feeling like the rug had been pulled out from under them, filed suit seeking to require Honeywell to continue to pay. The district court found that Honeywell's promise to pay for healthcare ended when the agreement expired and dismissed the suit. The agreement promises healthcare "for the duration of this Agreement," and this promise means exactly that: Honeywell's obligation to pay for its Fostoria retirees' healthcare ended when the agreement expired. We affirm.

## I. BACKGROUND

### A. Honeywell and the UAW's Collective-Bargaining History

For the many years that it operated the Fostoria plant, Honeywell staffed it with employees represented by the United Automobile, Aerospace, and Agricultural Implement Workers of America ("the UAW"). Honeywell and the UAW engaged in collective bargaining for decades, and they memorialized the outcome of those negotiations in successive collective-bargaining agreements.

As part of these negotiations, Honeywell agreed to pay for healthcare benefits for employees and retirees. According to the complaint, Honeywell wrote to retirees (or their surviving spouses) that their healthcare "will continue during your retirement" and is "for your lifetime." (Compl., R. 1, PageID 5.) But the promise made in the collective-bargaining agreements was less generous. The last agreement, which went into effect in 2009 and expired in 2011, provided: "For the duration of this Agreement, the Insurance Program shall be that which is attached hereto, hereinafter referred to as the Program." (2009 agreement, R. 19-2, PageID 456.) The "duration of this Agreement" was spelled out in a provision that said "[t]his Agreement shall continue in full force and effect until 11:59 PM, October 31, 2011." (*Id.* at PageID 487.) Earlier agreements contained similar provisions.

The last collective-bargaining agreement expired in 2011, the same year that Honeywell sold the Fostoria plant.  Honeywell nevertheless continued to underwrite retirees' healthcare benefits for a few years.  But in late 2015, Honeywell changed course and notified retirees that it would terminate healthcare contributions in 2017.

## B. The Retirees File Suit

This was an unwelcome development for the Fostoria retirees.  Retirees Watkins and Ulicny each worked at the Fostoria plant for around 30 years when they retired in 2004.  After Honeywell notified them that it was terminating their healthcare benefits, Watkins and Ulicny sued on behalf of a proposed class of nearly 1,000 retirees and their spouses and dependents.  They alleged violations under the Labor-Management Relations Act and the Employee Retirement Income Security Act.

In their view, the collective-bargaining agreement "promise[d] lifetime healthcare coverage and benefits for retirees and their spouses, eligible dependents, and surviving spouses," and Honeywell had breached this agreement by ending its healthcare contributions.  (Compl., R. 1, PageID 1.)  To argue that Honeywell had promised vested healthcare benefits, they pointed out that Honeywell had imposed caps on medical payments for retirees in 2001 that only went into effect in 2010, after the then-governing collective-bargaining agreement expired.  Even then, the caps only applied to employees who retired after 2001.  The retirees also highlighted a letter that Honeywell wrote to the UAW, incorporated in the 2009 agreement, which said that the "latest projections estimate that the caps should not hit"—that is, have a practical effect on any retiree—"until after the 2009-2011 contract expires."  (*Id.* at PageID 5.)  That letter also noted Honeywell's "legacy retiree medical expense."  (*Id.*)

The complaint also alleged other indicia that Honeywell had planned to provide healthcare benefits for the duration of retirees' lives.  As told in the complaint, Honeywell acknowledged that employees had "lifetime family healthcare."  (*Id.* at PageID 4.)  For instance, Honeywell wrote to retirees' surviving spouses that it would "continue medical for your lifetime."  (*Id.* at 5.)  It also rescinded a statement to its retirees that it "reserves the right" to "terminate" healthcare, explaining that the termination right "does not pertain to retiree medical

benefits negotiated by a collective bargaining unit." (*Id.*) Finally, the complaint pointed out that Honeywell provided healthcare benefits to Fostoria retirees for five years after the final collective-bargaining agreement expired.

Honeywell moved to dismiss the complaint for failure to state a claim under Rule 12(b)(6). The retirees moved for summary judgment and sought to enjoin Honeywell from ending its payments for their healthcare.

## C. The Decision Below

The district court granted Honeywell's motion to dismiss and denied as moot the retirees' summary judgment motion. The court below started with the text of the final collective-bargaining agreement, which provided that healthcare coverage would apply "[f]or the duration of this Agreement"—in other words, "until 11:59 PM, October 31, 2011." (Order, R. 29, PageID 1457–58 (quoting 2009 agreement, R. 19-2).) The court reasoned that this language "is clear and expresses an unambiguous intent and agreement that the benefits were assured only for three years, not for life." (*Id.* at PageID 1463.) The court contrasted the language in the agreement providing healthcare benefits with the language that discussed pension benefits. The language discussing pension benefits expressly said that pension benefits vested for life; no similar language said that healthcare benefits would vest for life. Finding the contract unambiguous, the district court did not consider any of the retirees' extrinsic evidence.

The retirees appealed.

## II. ANALYSIS

### A. The Agreement is Unambiguous

We review the district court's grant of a Rule 12(b)(6) motion to dismiss without deference, interpreting the complaint in the way most favorable to the retirees. *See Saab Auto. AB v. General Motors Co.*, 770 F.3d 436, 440 (6th Cir. 2014). We "interpret contracts according to their plain meaning, in an ordinary and proper sense." *See Rogers v. Internal Rev. Serv.*, 822 F.3d 854, 860 (6th Cir. 2016). That means we do not look at extrinsic evidence unless the contract is ambiguous. *See Tackett v. M & G Polymers USA, LLC*, 811 F.3d 204, 208–09 (6th

Cir. 2016) (*Tackett III*). True linguistic ambiguities are "rare in contract cases." *Stryker Corp. v. Nat. Union Fire Ins. Co.*, 842 F.3d 422, 426 (6th Cir. 2016) (quoting E. Allen Farnsworth, *"Meaning" in the Law of Contracts*, 76 Yale L.J. 939, 954 (1967)).

### 1. Our Prior Opinions

Because this case does not come to us on a blank slate, a bit of history is in order. For many years, this court applied the so-called *Yard-Man* inference to collective-bargaining agreements. *See Int'l Union, United Auto., Aerospace, & Agric. Implement Workers of Am. v. Yard-Man, Inc.*, 716 F.2d 1476, 1479 (6th Cir. 1983). Under that inference, this court "plac[ed] a thumb on the scale in favor of vested retiree benefits in all collective-bargaining agreements." *M & G Polymers USA, LLC v. Tackett*, 135 S. Ct. 926, 935 (2015). We viewed an agreement's general-durational clause—the clause that typically says when the contract goes into and out of effect—to "say[] nothing about the vesting of retiree benefits" unless the contract contained specific durational language that referred to retiree benefits. *Noe v. PolyOne Corp.*, 520 F.3d 548, 555 (6th Cir. 2008).

*Tackett* retired this inference. In *Tackett*, the Supreme Court said that a collective-bargaining agreement is first and foremost a contract, which should be interpreted "according to ordinary principles of contract law, at least when those principles are not inconsistent with federal labor policy." 135 S. Ct. at 933. In the Supreme Court's view, the *Yard-Man* inference departed from ordinary contract principles. As it explained, "placing a thumb on the scale in favor of vested retiree benefits" has "no basis in ordinary principles of contract law" because it "distorts the attempt 'to ascertain the intention of the parties.'" *Id.* at 935 (citation and emphasis omitted). Courts should, instead, interpret collective-bargaining agreements according to their terms and record evidence. As part of that analysis, courts should not require contracts "to include a specific durational clause"—rather than a general-durational clause—"for retiree health care benefits to prevent vesting." *Id.* at 936. The Supreme Court also reminded courts to consider traditional contract principles that "courts should not construe ambiguous writings to create lifetime promises" and that contractual obligations generally end "'upon termination of the bargaining agreement.'" *Id.* at 936–37 (citation omitted).

Since *Tackett*, we have spoken at least five times on general-durational clauses and promises to provide healthcare.  In the first of these cases, *Tackett III*, on remand from the Supreme Court, we discussed the kinds of ordinary contract principles a court might apply. We explained that while the Supreme Court's opinion in *Tackett* "prevents us from presuming that 'absent specific durational language referring to retiree benefits themselves, a general durational clause *says nothing* about the vesting of retiree benefits,' we also cannot presume that the *absence* of such specific language, by itself, evidences an intent *not* to vest benefits or that a general durational clause says *everything* about the intent to vest."  811 F.3d at 209 (citation omitted).  We remanded the case to the district court to apply these principles.

In two later cases, we held that an agreement's general-durational clause unambiguously applied to the promise to provide healthcare benefits.  The first of those cases—*Gallo*—read a contract that stated that "[c]ontinued hospitalization, surgical and medical coverage will be provided without cost to past pensioners."  *Gallo v. Moen Inc.*, 813 F.3d 265, 269 (6th Cir. 2016).  After canvassing the agreement, we concluded that nothing in the agreement suggested that the company "committed to provide unalterable healthcare benefits to retirees and their spouses for life."  *Id.*  In fact, we noted that when the contract intended benefits to vest for life, as it did with pensions, it used express language to say so.  *Id.* at 270.  No "for life" language existed in the promise to provide healthcare.  *Id.*  We also found that the agreement's promise to "continue" benefits suggested that those benefits had not vested.  As we explained, "[t]here would be no need to 'continue' such benefits if prior [agreements] had created vested rights to such benefits."  *Id.*  Likewise, in *Cole*, we held that an agreement that promised that retiree healthcare contributions "shall be continued" did not promise benefits for life.  *Cole v. Meritor, Inc.*, 855 F.3d 695, 699–700 (6th Cir. 2017).

On the other hand, the two other cases show what we said in *Tackett III:* a contract's general-durational clause will not always apply to a promise to provide healthcare.  In *Reese III*, we found an ambiguity to exist about whether a general-durational clause applied to the promise to provide healthcare because the parties had "carved out certain benefits, such as life insurance and healthcare insurance," from the general-durational clause, "and stated that those coverages ceased at a time different than other provisions of the [agreement]."  *Reese v. CNH Indus. N.V.*,

854 F.3d 877, 882 (6th Cir. 2017) (*Reese III*).  The contract's silence as to whether benefits continued past the termination date of the agreement "further[ed]" this ambiguity.  *Id.*  We also found revealing that the contract tied healthcare benefits to pension eligibility, which added to the ambiguity about the parties' intentions.  *Id.* at 883.

*Kelsey-Hayes* similarly found that, where certain healthcare benefits were time limited but others were not, it was ambiguous whether a general-durational clause applied to the promise to provide healthcare.  *Int'l Union, United Auto., Aerospace, & Agric. Implement Workers of Am. v. Kelsey-Hayes Co.*, 854 F.3d 862, 867 (6th Cir. 2017).  The agreement in *Kelsey-Hayes* used "three different types of durational language for specific provisions within the agreement."  *Id.* at 872.  Instead of permitting unilateral termination, the "general-durational clause perpetuated the agreement year-to-year and permitted modification only if the parties arranged a conference to negotiate after timely written notice of one party's desire to modify."  *Id.* at 871.  We found that those requirements "govern[ed] healthcare benefits" as well.  *Id.* at 868.  Finally, the contract did not say what should happen in the event that the agreement was terminated in part but not in full, which in fact happened leading up to the suit.  *Id.*  Finding the agreement ambiguous, we turned to extrinsic evidence and concluded that health benefits had vested.  *Id.* at 870–71.

### 2. *The Fostoria Agreement*

Against this backdrop, we must decide whether the Fostoria agreement is more similar to the contracts at issue in *Gallo* and *Cole* or in *Reese III* and *Kelsey-Hayes*.  The district court, which issued its opinion before we had decided *Cole*, *Reese III*, or *Kelsey-Hayes*, thought that the agreement was "congruent" with *Gallo*, concluding that "the pertinent language in this case is clear and expresses and unambiguous intent and agreement that the benefits were assured only for three years, not for life."  (Order, R. 29, Page ID 1462–63.)  We agree.

The Fostoria plant agreement provides, "For the duration of this Agreement, the Insurance Program shall be that which is attached hereto, hereinafter referred to as the Program."  (2009 agreement, R. 19-2, PageID 456.)  The phrase "[f]or the duration of this Agreement" limits Honeywell's promise to provide healthcare: for as long as the agreement lasts, Honeywell will provide healthcare as discussed in the Insurance Program.  The "duration" is set by the

agreement's general-durational clause, which in turn provided that the agreement "shall continue in full force and effect until 11:59 PM, October 31, 2011." (*Id.* at PageID 487.) Read in tandem, these two clauses unambiguously promise healthcare benefits until October 31, 2011—the "duration" of the agreement.

Indeed, this contract language is even more specific than the language we considered in our prior opinions. Unlike in any of those cases, this contract expressly states that the general-durational clause applies to the promise to provide healthcare. We acknowledged in *Reese III* that this type of language could render a contract unambiguous. *Reese III*, 854 F.3d at 883. And this agreement lacks the features that we found in *Reese III* or *Kelsey-Hayes* to create an ambiguity. Honeywell and the retirees have not "carved out certain benefits, such as life insurance and healthcare insurance, and stated that those coverages ceased at a time different than other provisions of the [agreement]." *Id.* at 882. Nor are the complicated facts of *Kelsey-Hayes* present here. *See Kelsey-Hayes*, 854 F.3d at 867–69.

Finding "[f]or the duration of this Agreement" to be unambiguous against vesting aligns us with other courts. For instance, in *Pabst Brewing Co. v. Corrao*, the Seventh Circuit read an indistinguishable collective-bargaining agreement that said healthcare would apply "[f]or the term of this Agreement" to be unambiguous. 161 F.3d 434, 435 (7th Cir. 1998). The court rejected the retirees' argument that the phrase "is one of those contractual terms that may seem clear on its face but in reality is ambiguous, rather like the ship Peerless or the use of specialized trade jargon." *Id.* at 441 (emphasis deleted). "Harsh though it may have been," the court saw "no room in the language of this agreement to turn to [the retiree's] extrinsic evidence." *Id.* at 442. Other circuits have reached similar results. *E.g.*, *Barton v. Constellium Rolled Products-Ravenswood, LLC*, 851 F.3d 349, 354 (4th Cir. 2017) (holding that the clause "shall remain in effect for the term of this . . . Labor Agreement" is "explicit durational language" that "clearly indicates that the retiree health benefits did *not* vest"); *Crown Cork & Seal Co., Inc. v. Int'l Ass'n of Machinists & Aerospace Workers*, 501 F.3d 912, 917 (8th Cir. 2007) ("A clause expressly limiting the duration of the retirement health benefits to the duration of the [agreement] is inconsistent with an intent to vest health benefits for life." (internal marks and citation omitted)).

**B. The Retirees' Counterarguments**

The retirees go to and fro with the contract language in an effort to find an ambiguity that would permit us to consider extrinsic evidence, but none of their arguments makes ambiguous the promise to pay for healthcare for the agreement's "duration."

*1. The Caps Do Not Create an Ambiguity*

The closest that the retirees come to finding a wrinkle is by pointing to the part of the contract that capped Honeywell's healthcare contributions. These caps were first negotiated in 2001 and adopted in each successive agreement. By their terms, the caps applied only to workers who retired after 2001. And for those retiring after 2001, the caps only went into legal effect in 2010. Even then, the parties understood that the caps would have no immediate practical effect: Honeywell wrote in a letter to the UAW incorporated in the 2009 agreement that the "latest projections" were that the caps "should not hit until after the 2009-2011 contract expires." (Letter in 2009 agreement, R. 19-2, PageID 512.) This same letter also said, "The Company continues to agree that healthcare benefits, including [maximum yearly distribution] Caps, for both active employees and employees who retire on or after November 1, 2001 will be mandatory subjects of future bargaining." (*Id.*)

There is a good reason for a company to adopt healthcare caps, even if caps take effect only far in the future: because companies must recognize as a liability on their balance sheet the present value of their anticipated future healthcare costs, caps keep companies from needing to recognize millions (or more) in future potential liability. *Wood v. Detroit Diesel Corp.*, 607 F.3d 427, 428–29 (6th Cir. 2010).

In any case, that the caps contemplated healthcare benefits into the future did not mean that Honeywell had promised to provide benefits forever. It reflects that the parties "anticipated, or even hoped, that these benefits would continue." *Cole*, 855 F.3d at 701. It did not "mean that [Honeywell] is bound to provide these benefits for the life of the retirees." *Id.* The caps do not overcome the clear statement that healthcare benefits would last "[f]or the duration of this Agreement."

Even if caps could support a theory that healthcare vested for employees who retired before 2001, the retirees here did not pursue that theory (nor could they, as proposed class representatives Watkins and Ulciny both retired in 2004). More to the point, singling out post-November-2001 retirees could reflect the inherent "give and take" of collective bargaining—the UAW and Honeywell could agree on caps for future retirees, in exchange for not imposing caps on those already retired, and they would continue to negotiate on those caps and other provisions in future sessions. *Cf. Barton*, 851 F.3d at 356 (finding that caps did not manifest "any latent intent to vest the retiree health benefits").

### 2. *The Retirees Do Not Otherwise Identify an Ambiguity*

As for the retirees' other arguments, we have rejected them before.

First, in both *Gallo* and *Cole*, we explained that a promise to provide "continued" healthcare coverage does not suggest coverage in perpetuity. To the contrary, we said that a promise that "[c]ontinued . . . coverage will be provided" implies that healthcare benefits had not vested, because "[t]here would be no need to 'continue' benefits if prior [agreements] had created vested rights to such benefits." *Gallo*, 813 F.3d at 270; *see also Cole*, 855 F.3d at 700 (holding that "continuance" language was "not sufficient to vest the retirees with healthcare benefits for life"). And though in *Kelsey-Hayes* we looked at "continuance" language to find an ambiguity, the contract there used "'continue' language for general healthcare benefits" while "explicitly time-limit[ing]" certain other healthcare promises, raising an ambiguity about the duration of the general healthcare benefits. 854 F.3d at 867. That difference is absent here.

Second, the retirees read too much into what we said in *Tacket III* that "contracts incorporate existing law . . . and that subsequent changes in the law are not incorporated unless the contract so indicates." 811 F.3d at 209. That a contract incorporates existing law is an ordinary principle of contract law, but this court has already considered—and rejected—the retirees' argument that *Yard-Man* lingers as the "existing law" of a contract. We explained in *Gallo* that this argument "would have been just as true in *Tackett*," but nothing there "hints at the idea that *Yard–Man* would linger, vest as it were, as a precedent that would bind future interpretations of such agreements." *Gallo*, 813 F.3d at 272.

Third, that the agreement tied eligibility for healthcare coverage to pension eligibility does not, for this particular contract, raise an ambiguity about the duration of the healthcare benefits.  A document incorporated into the agreement promised healthcare to each "surviving spouse eligible to receive benefits under the Retirement Plan."  (1976 Insurance Program, R. 19-3, PageID  620.)  Entire-agreement evidence like this bears on whether a contract is ambiguous. *See Tackett III*, 811 F.3d at 208.  And tying healthcare benefits to pension eligibility could create ambiguity about whether a general-durational clause was meant to apply to healthcare coverage. *Reese III,* 854 F.3d at 882–83.  But the agreement here is much different from the agreement we considered in *Reese III*, which lacked language stating the healthcare coverage would last "for the duration of th[e] Agreement."  As we said in *Reese III*, "if the [agreement] clearly stated that the general-durational clause was intended to govern healthcare benefits, the [agreement] would most likely be unambiguous." *Id.* at 883.  So it is here.  The Fostoria agreement states that healthcare coverage would last "[f]or the duration of th[e] Agreement," so tying healthcare to pension benefits has not made the duration of healthcare coverage ambiguous.

Fourth, that the agreement contemplates early benefits termination for active employees but not retirees does not make it ambiguous.  It is true that Honeywell could terminate benefits for employees laid off, on disability, on leave, or fired after twelve months.  But there were no similar restrictions for retirees because a retiree is not an active employee—a retiree cannot be laid off, put on disability, on leave, or fired.  Nor does it matter that the agreement provided a way to end the company's obligations for retirees who did not pay their own healthcare costs.

Finally, the retirees do not allege a plausible theory for a patent or latent ambiguity that opens the door to extrinsic evidence.

None of the retirees' evidence shows that "[f]or the duration of this Agreement" contains a patent ambiguity that "clearly appear[s] on the face of a document, arising from the language itself." *Sault Ste. Marie Tribe of Chippewa Indians v. Granholm*, 475 F.3d 805, 812 (6th Cir. 2007) (quoting *Black's Law Dictionary* 80 (7th ed. 1999)).  Retirees do not argue that "[f]or the duration of this Agreement" is unclear; instead, they point back to the caps, the use of the word "continue," the early termination mechanisms, and the tying of healthcare and pension together to argue that the contract is ambiguous.  We have already rejected these arguments, and in any

case they say nothing about whether the phrase "[f]or the duration of this Agreement" might not mean what it says.

Nor do the retirees allege a latent ambiguity, the type of ambiguity to arise not from the face of the document "but instead . . . from a collateral matter when the document's terms are applied or executed." *Id.* (quoting *Black's Law Dictionary* 80 (7th ed. 1999)). They do not claim that "[f]or the duration of this Agreement" is a term of art or has a specialized meaning that would give rise to a latent ambiguity. And they do not point to "the sort of real-world peculiarity at issue in the case of the two ships Peerless." *Stryker Corp.*, 842 F.3d at 428.

At bottom, the retirees' theory of ambiguity would swallow the parol evidence rule. The retirees "seek" to use extrinsic evidence "to fill a gap that does not exist," which "contradicts the fundamental principle that parol evidence under the guise of a claimed latent ambiguity is not permissible to vary, add to, or contradict any other plainly expressed terms of the writing." *Id.* (alterations and marks omitted).

## III. CONCLUSION

We affirm the judgment of the district court.