GIBBONS, J., delivered the opinion of the court in which DONALD, J., joined in the judgment. DONALD, J. (pg. 887), delivered a separate opinion concurring in the result. SUTTON, J. (pp. 887-93), delivered a separate dissenting opinion.
OPINION
JULIA SMITH GIBBONS, Circuit Judge.
Defendants-appellants CNH Industrial N.V. and CNH Industrial America LLC (collectively “CNH”) appeal the district court’s order granting plaintiffs’ motion for reconsideration. The trial court reversed its grant of summary judgment for CNH and instead granted summary judgment for plaintiffs. In this appeal, CNH again asks this court to find that plaintiffs’ right *879 to lifetime healthcare benefits failed to vest. If, however, we were to find that plaintiffs’ right had vested, CNH believes the district court erred in finding that CNH’s proposed changes were not “reasonably commensurate” with plaintiffs’ current plan.
This matter is complicated by a change in the law since this long-running litigation began. In light of M & G Polymers USA, LLC v. Tackett, — U.S. -, 135 S.Ct. 926, 190 L.Ed.2d 809 (2015), which abrogated this circuit’s Yard-Man line of cases, the district court had to revisit the question of whether plaintiffs had a vested right to lifetime healthcare benefits. The court ultimately found that they did. Because we find that the CBA is ambiguous, and because the extrinsic evidence indicates that parties intended for the healthcare benefits to vest for life, we affirm the district court’s vesting determination. Remand to the district court is proper, however, because it failed to properly weigh the costs and the benefits of the proposed plan, as instructed by Reese II.
I.
This case’s long and complicated factual and procedural history has been recounted several times by this court and by the district court. Plaintiffs, former employees of CNH who retired between 1994 and 2004, filed suit in the Eastern District of Michigan in 2004, seeking a declaration that they were entitled to lifetime healthcare benefits, an injunction requiring CNH to “maintain the level of retiree health care benefits currently in effect,” and damages for injuries the retirees might sustain if the benefits were terminated. Reese v. CNH Am. LLC, 574 F.3d 315, 319 (6th Cir. 2009) (Reese I). In 1971, CNH (then known as Case Corporation) and the United Automobile, Aerospace, and Agricultural Workers of America (“UAW”) entered into a collective-bargaining agreement (“CBA”), in which CNH agreed “to provide healthcare insurance to its retired employees and their spouses who were receiving a [pension or a spouse’s pension]” from the company. Id. at 318. “From 1974 through 1995, each CBA (in three- or four-year terms) renewed this commitment in ‘substantially unchanged’ form, and each CBA provided that employees did not have to pay premiums in order to receive coverage.” Id. (internal citations omitted).
In 1998, CNH and UAW entered into the CBA that generated this lawsuit. Id. That CBA was in effect until May 2, 2004, and provided that:
Employees who retire under the Case Corporation Pension Plan for Hourly Paid Employees after 7/1/94, or their surviving spouses eligible to receive a spouse’s pension under the provisions of that Plan, shall be eligible for the Group benefits as described in the following paragraphs.
Id. The paragraphs that followed listed the “Medical” and “Prescription Drug” benefits available to all classes of covered retirees regardless of the duration of their service before retirement. Id- “The CBA does not spell out what ‘Medical’ benefits are included; it just says that eligibility for specific coverage will be based on each plan’s eligibility requirements, and goes on to note that no contributions ... are required for the Health Care Plans....” Id. (internal quotations and citations omitted.)
Ultimately, the district court and the Reese I court faced two questions: “Did [CNH] in the 1998 CBA agree to provide health-care benefits to retirees and their spouses for life? And, if so, does the scope of this promise permit CNH to alter these benefits in the future?” Reese v. CNH Am. LLC, 694 F.3d 681, 683 (6th Cir. 2012) (Reese II). In Reese I, this court answered both questions in the affirmative, but remanded to the district court so that it could determine “how and in what circum *880 stances CNH may alter [the healthcare benefits].... ” Reese I, 574 F.3d at 327. On remand, the district court failed to reach the reasonableness question and did not create a factual record upon which this court could rule. Reese II, 694 F.3d at 683. Instead, it found that CNH could not unilaterally make changes to the scope of plaintiffs’ healthcare benefits, which was in conflict with our commands in Reese I. Thus, the case was remanded to the district court again, this time with a list of seven factors to consider when making its reasonableness-of-the-proposed-plan determination and with clear instructions that CNH could make unilateral changes to the plan.[1] Reese II, 694 F.3d at 685-86.
While on this second remand, another unexpected wrinkle was added to this case when the Supreme Court abrogated this circuit’s Yard-Man decision and its progeny. M & G Polymers USA, LLC v. Tackett, — U.S. -, 135 S.Ct. 926, 930, 190 L.Ed.2d 809 (2015) (Tackett). Because Yard-Man created an inference in favor of employees in collective-bargaining cases, Reese I, 574 F.3d at 321, the district court was required to reconsider whether plaintiffs had a vested right to lifetime healthcare benefits. Initially, the district court found that they did not, noting that it was “[constrained by the Supreme.Court’s decision” in Tackett. (DE 445, Op. & Order, Page ID 16912.) However, on plaintiffs’ motion for reconsideration, the district reversed course and found not only that plaintiffs’ rights were vested even after Tackett, but also that CNH’s proposed changes were unreasonable. Thereafter, CNH filed this timely appeal.
II.
We review the district court’s grant of summary judgment de novo. Domingo v. Kowalski, 810 F.3d 403, 410 (6th Cir. 2016) (citing Green Party of Tenn. v. Hargett, 767 F.3d 533, 542 (6th Cir. 2014)). Construing the evidence in the light most favorable to the nonmovant, id. (citing Villegas v. Metro. Gov’t of Nashville, 709 F.3d 563, 568 (6th Cir. 2013)), summary judgment is appropriate if “the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law.” Fed. R. Civ. P. 56(a).
III.
Before the Supreme Court decided Tackett, the rights created by collective-bargaining agreements were reviewed with a thumb on the scale in favor of employees. Tackett, 135 S.Ct. at 935. This doctrine, known most commonly as the YardMan inference, was the law in this circuit for more than thirty years. And it was the law in effect when this court and the dis *881 trict court initially reviewed the rights at issue in this case. In Tackett, the Supreme Court abrogated the Yard-Man inference and instructed courts to apply “ordinary principles of contract law” when reviewing collective-bargaining agreements. Id. at 937. Thus, the Supreme Court found, despite Yard-Man and its progeny’s claim to the contrary, that we had not been employing ordinary contract-interpretation principles. What is hard to disentangle, however, is how many, if any, of the contract principles created by the Yard-Man line of cases survive Tackett. Presumably, not every contract-interpretation principle found in those cases impermissibly relied on inferences in favor of employees. But, Tackett required us to revisit those old rules to weed out impermissible assumptions and inferences.
On remand from the Supreme Court, we interpreted the high Court’s instructions, and noted the following, non-exhaustive list of ordinary principles of contract law:
• [A]s with any other contract, the parties’ intentions control.
• Where the words of a contract in writing are clear and unambiguous, its meaning is to be ascertained in accordance with its plainly expressed intent.
• Although a court may look to known customs or usages in a particular industry to determine the meaning of a contract, the parties must prove those customs or usages using affirmative ev-identiary support in a given case.
• [T]he written agreement is presumed to encompass the whole agreement of the parties.
• Courts [should] avoid constructions of contracts that would render promises illusory' because such promises cannot serve as consideration for a contract.... [A] promise that is “partly” illusory is by definition not illusory.
• [CJourts should not construe ambiguous writings to create lifetime promises .... [Contracts that are silent as to their duration will ordinarily be treated not as “operative in perpetuity” but as “operative for a reasonable time.”
• [T]raditional rules of contractual interpretation require a clear manifestation of intent before conferring a benefit or obligation.
• Contractual obligations will cease, in the ordinary course, upon termination of the bargaining agreement.
• When a contract is silent as to the duration of retiree benefits, a court may not infer that the parties intended those benefits to vest for life.
Tackett v. M & G Polymers USA, LLC, 811 F.3d 204, 208 (6th Cir. 2016) (Tackett III) (citing Tackett, 135 S.Ct. at 933-37). The Tackett III court went on to cite additional principles highlighted by Justice Ginsburg’s concurrence:
• Under the cardinal principle of contract interpretation, the intention of the parties, to be gathered from the whole instrument, must prevail.
• [W]hen the contract is ambiguous, a court may consider extrinsic evidence to determine the intentions of the parties .... [F]or example, the parties’ bargaining history.
.•No rule requires “clear and express” language in order to show that parties intended health-care benefits to vest.
• Constraints upon the employer after the expiration date of a collective-bargaining agreement ... may be derived from the agreement’s “explicit terms,” but they may arise as well from implied terms of the expired agreement.
Id. at 208-09 (citing Tackett, 135 S.Ct. at 937-38 (Ginsburg, J., concurring)). “Importantly,” Tackett III noted, “the Court rejected Yard-Man’s inferences in favor of retirees, but also declined to adopt an ‘explicit language’ requirement in favor of *882 companies.” Id. at 209 (citing Tackett, 135 S.Ct. at 937-38 (Ginsburg, J., concurring)); see also Litton Fin. Printing Div., a Div. of Litton Bus. Sys., Inc. v. N.L.R.B., 501 U.S. 190, 203, 207, 111 S.Ct. 2215, 115 L.Ed.2d 177 (1991) (“[A] collective-bargaining agreement [may] provide!] in explicit terms that certain benefits continue after the agreement’s expiration,” but nevertheless, “constraints upon the employer after the expiration date of a collective-bargaining agreement ... may arise as well from the express or implied terms of the expired agreement itself.”). Thus, relying heavily on Justice Ginsburg’s concurrence, Tackett III removed presumptions in favor of vesting, but also explicitly declined to shift that presumption to the employer.
The Tackett III court then proceeded to discuss what effect the absence of any durational language has on the vesting of rights. It held that:
[W]hile the Supreme Court’s decision [in Tackett] prevents us from presuming that “absent specific durational language referring to retiree benefits themselves, a general durational clause says nothing about the vesting of retiree benefits,” we also- cannot presume that the absence of such specific language, by itself, evidences an intent not to vest benefits or that a general durational clause says everything about the intent to vest.
Tackett III, 811 F.3d at 209. The Tackett III court highlighted that the retirees in that case acknowledged that the agreements at issue lacked clear and express language vesting benefits, but still remanded the case to the district court so that it could determine whether certain documents were part of the agreements or “may otherwise serve as extrinsic evidence.” Id. at 210 & n.3.
While, in some cases, the presence of a general-durational clause will cure any ambiguity as to the duration of benefits, see Gallo v. Moen, Inc., 813 F.3d 265, 268 (6th Cir. 2016) (finding that, due to the lack of a specific end date, the CBA’s healthcare benefits should be governed by agreement’s general-durational clause), the general-durational clause here does not. This is so because the parties in this case carved out certain benefits, such as life insurance and healthcare insurance, and stated that those coverages ceased at a time different than other provisions of the CBA. True, this provision says only that healthcare coverage continues past the date of retirement and is silent on whether the benefits continue past the termination date of the agreement. But, when read in conjunction with the whole instrument, as Tackett III commands, this silence, rather than resolving ambiguity, furthers it. We cannot, and should not, presume that the general-durational clause here says everything about the parties’ intentions. Tackett III, 811 F.3d at 209.
To find ambiguity in this case, partially from the silence as to the parties’ intentions, does not offend the Supreme Court’s mandate from Tackett that we not infer vesting from silence. There is surely a difference between finding ambiguity from silence and finding vesting from silence. The latter is impermissible after Tackett; the former permits the court to turn to extrinsic evidence to determine the intent of the parties — precisely the goal in any contract dispute.
Further, just as the Supreme Court has commanded that we not infer vesting from silence, it has directed us not to infer vesting from the tying of benefits to achievement of pensioner status. But, as with silence, it has not directed us to ignore tying’s ability to create ambiguity. Here, healthcare benefits were tied to pension eligibility. This, by itself, says little about whether those healthcare benefits should vest for life. It does, however, ere- *883 ate an ambiguity about the parties’ intentions. Inferring vesting from tying alone violates Tackett and ordinary principles of contract interpretation. Finding an ambiguity from tying allows a court to explore the extrinsic evidence to discover what the parties actually intended. This, as with silence, does not offend any principle of contract interpretation. Instead, it moves us closer to the ultimate goal in any contract dispute: discovering the parties’ true intentions. See Tackett III, 811 F.3d at 208 (holding that the “cardinal principle of contract interpretation” should govern: what were the parties’ intentions?) (citing Tackett, 135 S.Ct. at 937-38 (Ginsburg, J., concurring)).
Silence as to the duration of retiree healthcare benefits, when combined with those benefits’ coupling to pensioner status and their segregation from other entitlements in the CBA, overcomes any presumption that the general-durational clause should govern. See id. (noting also our limitation on presuming that a general-durational clause, by itself, conclusively answers the question of vesting). If these elements were not present, or if the CBA clearly stated that the general-durational clause was intended to govern healthcare benefits, the CBA would most likely be unambiguous. But this is not the case, and Tackett III prohibits us from relying exclusively on the general-durational clause to resolve this matter.[2] Here, presuming that the CBA’s general-durational clause says everything about the parties’ intentions ignores evidence, taken from the whole instrument, indicating that the parties may have intended the benefits to extend beyond the end of the CBA. Giving dispositive weight to the general-durational clause here would move the thumb from the employees’ side of the scale and place it on the side of employers. Tackett, however, sought to create a level playing field, not to foster an equally inequitable one. Accordingly, we reach the extrinsic evidence in this case to determine the parties’ intent.
The district court previously reviewed the extrinsic evidence and found that the plaintiffs’ rights had vested. The record supports the district court’s finding. For example, in an accounting document, CNH calculated the costs of certain retirees’ benefits, and when determining healthcare costs, based the figure on the employees’ life span. It is unlikely that an employer would base the future cost of supplying an employee with healthcare insurance on the employee’s life span, as CNH did here, if that employer knows that its healthcare obligations expire at a fixed date. Further, CNH representatives repeatedly told the company’s employees that retirees would have healthcare coverage for their lifetimes. For example, in a June 18, 1990 letter to Reba Williams, the spouse of a deceased retiree, CNH informed her she would have medical insurance “coverage[ ] for [her] lifetime.” (DE 153, Exh. 61.) And CNH intended to provide group insurance coverage to the spouses of retirees “in a consistent manner” to the way it handled Williams’s claim. (DE 154, Exh. 62.) These and other examples in the record indicate that CNH, the retirees, and the retirees’ spouses, intended and expected that the healthcare benefits provided were vested for life.
*884 However, unless a CBA says otherwise, the vesting of healthcare rights does not prevent reasonable modifications to those rights. Reese I, 574 F.3d at 325. Thus, we must consider whether CNH’s proposed changes are reasonable. In Reese II, we remanded this case to the district court so that it could consider, again, whether the proposed changes to plaintiffs’ plans were reasonable. Reese II, 694 F.3d at 683. In so doing, we listed seven non-exhaustive factors that the district court should consider. Id. at 685-86. Those factors were:
[1] What is the average annual total out-of-pocket cost to retirees for their healthcare under the old plan (the 1998 Group Benefit Plan)? What is the equivalent figure for the new plan (the 2005 Group Benefit Plan)?
[2] What is the average per-beneficiary cost to CNH under the old plan? What is the equivalent figure for the new plan?
[3] What premiums, deductibles and co-payments must retirees pay under the old plan? What about under the new plan?
[4] How fast are the retirees’ out-of-pocket costs likely to grow under the old plan? What about under the new plan? How fast are CNH’s' per-beneficiary costs likely to grow under each?
[5] What difference (if any) is there between the quality of care available under the old and new plans?
[6] What difference (if any) is there between the new plan and the plans CNH makes available to current employees and people retiring today?
[7] How does the new plan compare to plans available to retirees and workers at companies similar to CNH and with demographically similar employees?
Id. On remand, and after reconsidering whether plaintiffs’ rights had vested, the district court proceeded to consider these factors. It grouped the first five together and stated that these factors all pertain to comparing the proposed plan to the current plan. The district court then considered the two remaining factors at the end of its analysis: a comparison of the proposed plan to the plans CNH offers current employees and retirees and a comparison of CNH’s proposed plan to other similar companies’ plans.
The district court ultimately concluded that CNH’s proposed plan was not reasonably commensurate with the current plan, relying primarily, if not exclusively, on the first five factors — specifically, the increased costs to plaintiffs under the proposed plan. The district court found that plaintiffs and current employees and retirees “are in roughly similar positions in terms of their healthcare situation,” but yet found that this factor did not weigh strongly in favor of either party. It also found the final factor — -the comparison between CNH’s proposed plan and the plans offered by similar companies — did not weigh in favor of either party, and in its reasoning questioned the utility of this factor.
The district court’s analysis erred in several ways, and remand is necessary to address these mistakes. Reese II made clear that the district court was to consider not only any increased costs to plaintiffs, but also any additional benefits that inured to them. Reese II, 694 F.3d at 685. Specifically, we asked the district court to determine if “the retirees’ benefits differ in material respects from those offered to current employees and people retiring today,” and whether the proposed changes to the plan “are reasonable in light of changes in health care (including access to new medical procedures and prescriptions).” Id. (internal quotations and citations omitted). Thus, while the district court held that the two plans provide *885 roughly the same “quality of care” because both provide coverage for “medically necessary” procedures, this ignores that, before a procedure can be medically necessary, it must be medically possible. As we noted in Reese II, “[n]ew and better medical procedures arise while others become obsolete. And it is the rare medical innovation that costs less than the one it replaces.” Reese II, 694 F.3d at 683. Thus, “[rjetirees, quite understandably, do not want lifetime eligibility for the medical-insurance plan in place on the day of retirement, even if that means they would pay no premiums for it.” Id. at 683-84. Instead, “[tjhey want eligibility for up-to-date medical-insurance plans, all with access to up-to-date medical procedures and drugs.” Id. at 684. The district court’s failure to consider the increased benefits, along with the increased costs, necessitates remand.
The district court focused heavily on cost-shifting provided for in the proposed plan. It did so with good reason: many of the Reese II factors dealt with changes in costs for CNH and for plaintiffs. In considering those changes in costs, however, the district court made several mistakes. For those Medicare-eligible plaintiffs, the district court considered only the costs shifted away from CNH, and apparently presumed that plaintiffs would foot this entire bill. Of course this is not true; a substantial portion of the costs shifted to Medicare-eligible plaintiffs will be covered by the federal government. Thus, the true cost-shifting is less than that highlighted by the district court.
The district court also erred by focusing too heavily on the future increased costs to non-Medicare-eligible plaintiffs. No plaintiff-retiree, and very few plaintiff-spouses, will be ineligible for Medicare in 2032. Thus, the most dramatic cost-shifting under the proposed plan is more paper tiger than realistic expectation. There are, however, thirteen plaintiffs — very young spouses of retirees — who would be ineligible for Medicare in 2032. These unlucky thirteen would be subject to drastic increases in costs for their healthcare, and the district court refused to ignore them in its reasonableness analysis. Although it was right to acknowledge this small subset of the class, the district court -placed an undue amount of weight on their costs. In any institutional setting, there will be certain members who are harmed by policy decisions. These thirteen spouses fall into that camp.
Because the proposed plan was materially similar to the plan offered to current employees and retirees, while being less expensive to plaintiffs, the district court further erred in finding that this factor did not favor either side. First, the mere fact that the proposed plan was equal in substance to the plan offered to current employees and retirees weighs in favor of reasonableness. Reese II asked the district court “[wjhat difference (if any) is there between the new plan and the plans CNH makes available to current employees and people retiring today?” Reese II, 694 F.3d at 686. Thus, this reasonableness benchmark asked the district court to determine if the proposed plan was similar to the current plans being offered by CNH. The district court found that it was. Second, not only does the proposed plan place plaintiffs in substantially the same position in terms of healthcare benefits as current employees and retirees, but plaintiffs also pay less for these same benefits.
The district court was motivated to find this factor in equipoise by looking to benefits that post-2004 employees and retirees received outside the healthcare-benefit context. For example, while their premiums are higher than those under the proposed plan, current employees and retirees also receive higher pensions and a one *886 time contribution to a health-savings account. Requiring consideration of these benefits, subsequently bargained for by UAW and CNH, would essentially grandfather all past-retirees into the new CBA from which they were explicitly excluded. Requiring an equal increase in plaintiffs’ healthcare benefits for every benefit or concession won by current CNH employees is not part of the Reese II framework. The proposed plan must offer healthcare benefits similar to those received by current employees and retirees. It does not have to exceed this requirement to compensate plaintiffs for benefits to which they are not entitled. To do so would be not only unfair to CNH but also could have adverse consequences on future collective-bargaining agreements.
Finally, the district court erred in determining whether the proposed plan was reasonable in light of changes to healthcare. This factor asked the district court to review plans offered by “companies similar to CNH and with demographically similar employees.” Reese II, 694 F.3d at 686. The district court discounted the utility of this factor, noting that “[njaturally, the proposed plan will compare favorably to some plans and not to others, and the parties will surely locate the plans that support their respective litigation-induced positions and select those plans as comparators.” (DE 450, Op. & Order, Page ID 17031.) Yet, even though it acknowledged the inherent biases of the parties’ “cherry-picked” plans, the district' court still used plaintiffs’ comparator as the basis for its decision. (Id. at 17030, 17031.) It is true that the last factor is less than clear about what qualifies as a “similar company” or what exactly is meant by “demographically similar employees,” but this does not warrant ignoring as irrelevant the aggregate data of 900 companies. Many of these companies are large corporations (Ford, General Motors, AT&T, etc.) that are similar to CNH, and, while not perfect comparators, this aggregate data is worthy of consideration.
The district court also held that it could not consider the reasonableness of the proposed plan in piecemeal fashion. CNH challenges this holding and urges us to remand so that the district court can examine the proposed plan in this way. There is no law directly on point, and neither Reese I nor Reese II addresses this directly. There is language in both cases, however, that suggests that the court could permit the district court to sever the proposed plan and address each part individually. CNH claims Reese I supports its position that the terms of the proposed plan may be severed and examined individually. Specifically, it says that Reese Fs direction to the district court “to decide how and in what circumstances” CNH may alter such benefits suggests that the court may sever the terms. See Reese I, 574 F.3d at 327. Although not cited by CNH, language in Reese II also suggests that the terms may be severed. There, the court held that the reasonableness inquiry here “is a vexing one” and that “if the parties cannot resolve the [issues] on their own, we (and the district court) will do our best to resolve it for them.” Reese II, 694 F.3d at 686. Thus, we see no reason why the district court cannot examine individual terms of the proposed plan for reasonableness. And, allowing the district court to determine which terms are reasonable, and which are not, might facilitate the settlement process between the parties and could lead to a quicker resolution of this long-running litigation.
On remand, the district court should reconsider the factors presented in Reese II, with special attention on the increased benefits to plaintiffs — including those benefits created by progress in medical procedures and prescriptions. The district court should also consider how much of the cost *887 to Medicare-eligible retirees will be borne by the federal government or others. And lastly, the district court should reconsider whether the proposed plan is reasonable in light of the plans offered at similar companies — ie., large manufacturing corporations with union representation.[3] It should also look to the individual terms proposed and determine, if not reasonable on the whole, whether individual pieces of the plan are reasonable.
rv.
For the reasons stated above, we affirm the district court’s finding that plaintiffs’ right to lifetime healthcare benefits vested. Remand is necessary, however, so that the district court can reconsider the reasonableness of CNH’s proposed plan in light of Reese I, II, and the instructions they provide.
CONCURRENCE

. The seven factors are:
[1] What is the average annual total out-of-pocket cost to retirees for their healthcare under the old plan (the 1998 Group Benefit Plan)? What is the equivalent figure for the new plan (the 2005 Group Benefit Plan)?
[2] What is the average per-beneficiary cost to CNH under the old plan? What is the equivalent figure for the new plan?
[3] What premiums, deductibles and copay-ments must retirees pay under the old plan? What about under the new plan?
[4] How fast are the retirees’ out-of-pocket costs likely to grow under the old plan? What about under the new plan? How fast are CNH's per-beneficiary costs likely to grow under each?
[5] What difference (if any) is there between the quality of care available under the old and new plans?
[6] What difference (if any) is there between the new plan and the plans CNH makes available to current employees and people retiring today?
[7] How does the new plan compare to plans available to retirees and workers at companies similar to CNH and with demographically similar employees?
Reese v. CNH Am., LLC, 694 F.3d 681, 685-86 (6th Cir. 2012) (Reese II).

. To the extent that Tackett III and Gallo are in conflict — a dispute about which reasonable minds may differ — Tackett III, being first in time, must govern. To so hold is not an endorsement of Tackett Ill’s reasoning nor is it an indictment of Gallo’s) rather, it simply demonstrates adherence to this court’s precedent. Darrah v. City of Oak Park, 255 F.3d 301, 309-10 (6th Cir. 2001) (quoting Salmi v. Sec’y of Health & Human Servs., 774 F.2d 685, 689 (6th Cir. 1985)); see also 6th Cir. R. 32.1(b) ("Published panel opinions are binding on later panels. A published opinion is overruled only by the court en banc.”).

. The “demographically similar employees” language from this Reese II factor must do some work, and we believe comparing collectively-bargained-for agreements to collectively-bargained-for agreements, coupled with limiting the inquiry to large manufacturing corporations, will help ensure that the comparators are similar to CNH.