**NOT RECOMMENDED FOR FULL-TEXT PUBLICATION**

File Name: 19a0626n.06

Case No. 18-4184

**UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT**

| | | |
|---|---|---|
| MASCO CORPORATION, ET AL., | ) | **FILED** |
| | ) | Dec 19, 2019 |
| Defendants-Appellees, | ) | DEBORAH S. HUNT, Clerk |
| | ) | |
| | ) | ON APPEAL FROM THE UNITED |
| v. | ) | STATES DISTRICT COURT FOR |
| | ) | THE NORTHERN DISTRICT OF |
| WALDEMAR J. WOJCIK, | ) | OHIO |
| | ) | |
| Plaintiff-Appellant. | ) | |
| | ) | |

Before: MOORE, KETHLEDGE, and MURPHY, Circuit Judges.

MURPHY, Circuit Judge. In 1996, Andrew Rattray began working for KraftMaid Cabinetry. Seven years later Rattray entered into a contract with KraftMaid promising him a sizeable monthly pension if he "shall remain" in KraftMaid's employment "for at least five years." Yet Rattray left the company about two years later. When did the five-year clock that Rattray needed to "remain" with KraftMaid begin to run? Was it the date he signed the contract in 2003, in which case his retirement benefits never vested? Or was it the much earlier date of his initial employment, in which case those benefits vested immediately? Like the district court, we read the contract's language as unambiguously requiring five years of employment from the contract date. We thus affirm the dismissal of a complaint seeking Rattray's benefits.

I.

This case reaches us at the motion-to-dismiss stage, so we accept the following factual allegations from the complaint (and the items attached to the complaint) for purposes of this appeal. *Saab Auto. AB v. General Motors Co.*, 770 F.3d 436, 440 (6th Cir. 2014); *Rondigo, L.L.C. v. Twp. of Richmond*, 641 F.3d 673, 680–81 (6th Cir. 2011). Rattray began working for KraftMaid on April 1, 1996. He was one of "4 key executives"—including Thomas Chieffe, Donald Cox, and Donald Burgess—"who guided KraftMaid to become a billion dollar plus company." Chieffe was KraftMaid's president; Rattray was its senior financial officer and later its chief financial officer. In July 1999, KraftMaid established a supplemental pension plan for these executives. At some point, however, President Chieffe grew concerned that KraftMaid might fire the four officers before their benefits vested. They thus decided to enter into new contracts with KraftMaid for supplemental pension benefits under the authority of a Board of Directors resolution from 1989.

Rattray entered into his contract (which we will call the "Agreement") on August 23, 2003. He signed it on behalf of himself, and Burgess appears to have signed it on behalf of KraftMaid. The Agreement contained the following sentence: "If Executive shall remain in the Employment of the Corporation for at least five years, he shall be entitled to receive monthly from the Corporation the sum of FOUR THOUSAND FIVE HUNDRED DOLLARS AND NO CENTS, ($4,500), beginning, at the executive's discretion, any date after the first day of the 2nd month following such 'Normal Retirement Date', for a continuous period of 180 months." The Agreement defined "Employment of the Corporation" to "mean any service with any Masco Corporation company," and it defined "Normal Retirement Date" to begin on the first day of the month after Rattray turned 55. Separately, the Agreement provided that, if Rattray died while employed by KraftMaid, his beneficiaries would receive his then-existing salary for one year and

2

half of his salary for several more years. Its preamble added that KraftMaid offered these various benefits "in consideration of services rendered in the past and rendered in the future" by Rattray. The Agreement's definition section identified its "effective date" as the "latter" of August 23, 2003, or the issuance of a life insurance policy for purposes of the death-benefit provision.

KraftMaid, a subsidiary of Masco Corporation, later became Masco Cabinetry Middlefield, LLC. On May 20, 2005, a little less than two years after Rattray signed his Agreement, he quit Masco Cabinetry "due to concerns with Masco's accounting and financial practices." A few months later, Masco "coerced" the other executives into rescinding their agreements. Rattray signed no similar rescission, even though Masco ordered Chieffe to ask him to do so.

A decade later, Chieffe told Rattray that he thought Rattray could seek his benefits after he turned 55 on March 28, 2015. That month Rattray sent Masco a letter asking how to receive the monthly payments. Masco denied his request for payments. This refusal forced Rattray into bankruptcy and his home into foreclosure.

Rattray responded with a breach-of-contract suit under Ohio law against Masco and Masco Cabinetry (collectively "Masco") in federal bankruptcy court. After Masco moved to transfer this suit to the district court (to "withdraw the reference" in the language of bankruptcy), Rattray dismissed the suit and refiled it in Ohio state court. Masco then removed that state suit back to the bankruptcy court and filed another motion to transfer the case to the district court. The district court eventually granted this motion. In the meantime, Rattray substituted the trustee overseeing his bankruptcy estate—Waldemar Wojcik—as the proper plaintiff to litigate his breach-of-contract claims.

Apart from its procedural motions, Masco moved to dismiss the complaint on the ground that Rattray was not entitled to retirement benefits as a matter of law because he had not stayed

with KraftMaid for five years from the contract date.  The district court agreed and dismissed this suit.  The court read the Agreement's language that "the Executive shall remain in the Employment of the Corporation for at least five years" to require Rattray to work for KraftMaid for five years from the contract date.  Because Rattray left the company less than two years later, he did not meet this condition.  The court thus rejected Wojcik's contrary interpretation starting the five-year clock from Rattray's initial 1996 employment date.  "[I]f prior years of employment were meant to be counted toward the five-year requirement," the court reasoned, "it would not have made sense for the parties to include that provision at all."  Wojcik now appeals.

## II.

We start with two procedural issues.  The first: jurisdiction.  While the parties agree that the district court had subject-matter jurisdiction, we must independently assure ourselves of that fact.  *Prime Rate Premium Fin. Corp. v. Larson*, 930 F.3d 759, 764 (6th Cir. 2019).  The bankruptcy-jurisdiction statute (28 U.S.C. § 1334(b)) gives district courts "original but not exclusive jurisdiction of all civil proceedings arising under title 11 or arising in or related to cases under title 11."  "A claim is 'related to' a bankruptcy case if the 'outcome of that [claim] could conceivably have any effect on the estate being administered in bankruptcy.'"  *Waldman v. Stone*, 698 F.3d 910, 916 (6th Cir. 2012) (citation omitted).  Wojcik's suit meets this test because it could produce more funds for (and thus affect the size of) Rattray's bankruptcy estate.  *See id.*

The second: choice of law.  The Agreement states that it "shall be governed by the laws of the State of Ohio."  But the district court suggested that the Agreement might qualify as an "employee benefit plan" under the Employee Retirement Income Security Act (ERISA).  And other courts have noted that "parties may not contract to choose state law as the governing law of an ERISA-governed benefit plan."  *Prudential Ins. Co. v. Doe*, 140 F.3d 785, 791 (8th Cir. 1998);

*see Buce v. Allianz Life Ins. Co.*, 247 F.3d 1133, 1154–55 (11th Cir. 2001) (Carnes, J., concurring in the result). Thankfully, we need not decide this choice-of-law question because both sides agreed at oral argument that we should apply Ohio law for this appeal. While courts do not always allow parties to agree about the governing law in a contract, they do generally accept the parties' agreement about the governing law during the litigation. *See Wood v. Mid-Valley Inc.*, 942 F.2d 425, 426–27 (7th Cir. 1991). That is, courts do not treat choice-of-law questions like the jurisdictional questions that they must raise on their own. Instead, they regularly rely on the litigants' agreement about the governing law (or, more often, on one litigant's failure to dispute the issue) to avoid deciding what could be knotty choice-of-law questions. *Id.*; *Patton v. Johnson*, 915 F.3d 827, 837 (1st Cir. 2019); *Janvey v. Democratic Senatorial Campaign Comm., Inc.*, 712 F.3d 185, 194 n.6 (5th Cir. 2013); *Patton Boggs LLP v. Chevron Corp.*, 683 F.3d 397, 403 (D.C. Cir. 2012); *Flying J Inc. v. Comdata Network, Inc.*, 405 F.3d 821, 831 n.4 (10th Cir. 2005). Seeing no reason to depart from that path here, we look to Ohio contract law for the merits.

### III.

Under Ohio law, "[i]f a contract is clear and unambiguous, then its interpretation is a matter of law and there is no issue of fact to be determined." *Nationwide Mut. Fire Ins. v. Gunman Bros. Farm*, 652 N.E.2d 684, 685 (Ohio 1995) (citation omitted). To decide whether the contract is clear, a court must start with its language, *Westfield Ins. Co. v. Galatis*, 797 N.E.2d 1256, 1261 (Ohio 2003), giving the words "their plain and ordinary meaning 'unless manifest absurdity results, or unless some other meaning is clearly evidenced from the face or overall contents of the instrument,'" *Laboy v. Grange Indem. Ins. Co.*, 41 N.E.3d 1224, 1227 (Ohio 2015) (citation omitted). A contractual provision is clear when "it can be given a definite legal meaning," *Galatis*, 797 N.E.2d at 1261; it is ambiguous "only when [the] provision at issue is susceptible of more

than one reasonable interpretation," *Lager v. Miller-Gonzalez*, 896 N.E.2d 666, 669 (Ohio 2008). If, after a review of the contractual language alone, the court decides that "no ambiguity appears on [the contract's] face," the court may not rely on evidence outside of the contract "in an effort to demonstrate such an ambiguity." *Shifrin v. Forest City Enterps., Inc.*, 597 N.E.2d 499, 501 (Ohio 1992). The court must instead enforce the contract as written. *Id.*

Given these legal principles, this appeal turns on whether the following sentence in the Agreement is unambiguous: "If Executive shall remain in the Employment of the Corporation for at least five years, he shall be entitled to receive" the listed benefits. Masco says that the provision unambiguously required Rattray to remain with KraftMaid for five years from the contract date—August 23, 2003. Under this view, the language forecloses Rattray's request for benefits because he left the company about two years later. Wojcik responds that the provision could reasonably be read to start the five-year clock on the earlier date that he started at the company—April 1, 1996. Under this view, Rattray immediately met this condition because he had been employed by KraftMaid for over five years by the contract date.

We agree with Masco. When assessed from the "plain and ordinary meaning" of its words, *Galatis*, 797 N.E.2d at 1261, this disputed sentence unambiguously starts the five-year clock at the contract date. From a bird's-eye view, the sentence—"[i]f Executive shall remain in the Employment of the Corporation for at least five years, he shall be entitled to receive" the listed retirement benefits—naturally conveys to us (and we think to most readers) that the condition begins at the time the parties entered the contract.

This general instinct is confirmed by a review of the specific words. To begin with, the sentence uses the verb "remain." In this context, remain means "[t]o continue in the same state or condition" or "[t]o continue to be in the same place; stay or stay behind." *American Heritage*

*Dictionary* 1475 (4th ed. 2000); *see also Webster's II New College Dictionary* 937 (4th ed. 2001); *Oxford English Dictionary* 578 (2d ed. 1989). This verb conveys that a party has already been in a preexisting state or condition and will continue ("remain") in that same state or condition going forward. Here, then, the word suggests that the five-year period runs from a point in time *after* the start of Rattray's employment with KraftMaid. If, by contrast, the parties meant to start the clock from day one, "remain" was a poor choice of words. On his first day, Rattray began a new state of employment with KraftMaid; he was not "continu[ing] in the same state." *American Heritage Dictionary* at 1475. To start the clock from Rattray's initial employment date, the Agreement would have instead used a verb like "be" or "serve" (e.g., "if Executive shall serve in the Employment of the Corporation for at least five years").

In addition, the Agreement uses the verb phrase "shall remain"—a combination signaling that the contract imposes a forward-looking condition. Where, as here, a sentence uses "shall" in a conditional clause beginning with "if," the verb commonly adds a sense of obligation to the present tense of the primary verb. *See* Joseph Kimble, *The Many Misuses of Shall*, 3 Scribes J. Leg. Writing 61, 65 (1992); Otto Jespersen, *Essentials of English Grammar* § 25.7(2) (1933). This usage thus conveys that the condition starts in the present. Indeed, when this type of conditional clause uses a present-tense verb, it typically signals to the reader a "future time interpretation." *See* Rodney Huddleston & Geoffrey K. Pullum, *Cambridge Grammar of the English Language* 135, 210 (2002). That is how we read the relevant clause in the Agreement—as creating a future-looking condition starting from the date of the language (i.e., the date of the contract). Such a future-looking condition would not look backward to previous employment. If the Agreement had sought to include that prior employment, it would have said "if the Executive shall *have remained*" for the required time. In short, the verb usage and tense both convey that the five-year requirement

7

begins from the date of Rattray's contract with KraftMaid, not from the date of his employment with the company.

A view of the Agreement "as a whole" reinforces our conclusion that the disputed sentence looks to the future, requiring Rattray to work five years from the contract date. *Foster Wheeler Enviresponse, Inc. v. Franklin Cty. Convention Facs. Auth.*, 678 N.E.2d 519, 526 (Ohio 1997). For one thing, the Agreement defines "Employment of the Corporation" for purposes of the five-year clock to "mean any service with any Masco Corporation company," not just Rattray's service with KraftMaid. That the condition contemplated this type of contingency—that Rattray could switch jobs in the future—suggests that it established a future condition. For another thing, the contract's preamble says that KraftMaid agrees to provide the benefits to Rattray "in consideration of services rendered in the past and rendered in the future." So the Agreement itself recognizes that KraftMaid provided the benefits partially for future work. And this language demonstrates that Rattray had prior service with KraftMaid, but the disputed sentence still chose the word "remain" in the present tense. When, by comparison, the Agreement noted that Rattray would become only a general creditor of KraftMaid once his rights vested, it used the phrase "shall be and remain"—signaling that his general-creditor status started from the first day that his rights vested (and continued thereafter).

Wojcik's arguments do not convince us otherwise. He makes just one textual argument in support of his view: The disputed sentence does not include language *expressly* stating that the five-year period starts "from the date of this agreement." Looking at this Agreement from the perspective of a Monday-morning contract drafter, we agree that his proposed language would have removed all doubt (indeed, would have removed all non-frivolous contrary arguments) that the five-year period starts from the contract date. But the "additional clarity" that his proposed

language would provide does not render the actual language ambiguous. *Arrowood Indem. Co. v. Lubrizol Corp.*, 695 F. App'x 842, 849 (6th Cir. 2017). As written, the language has "a definite legal meaning." *Galatis*, 797 N.E.2d at 1261. Unambiguous language does not become ambiguous simply because it could have been written even more unambiguously.

For the most part, therefore, Wojcik resorts to outside-the-contract arguments. He highlights, among other things, KraftMaid financial statements that allegedly treated his benefits as vested in 2004; declarations from Chieffe and Rattray opining that they viewed their benefits as vesting immediately; and two other Masco supplemental pension plans for executives. Wojcik's request that we consider this extrinsic evidence faces both substantive and procedural hurdles.

Substantively, this request violates Ohio contract law. We have found that "no ambiguity appears on the face" of the Agreement. *Shifrin*, 597 N.E.2d at 501. That conclusion bars us from relying on outside evidence to depart from the contract's unambiguous meaning. *Id.* If anything, Wojcik's evidence confirms why Ohio bans extrinsic evidence. He, for example, cites another Masco company's plan from January 2003. But this agreement uses different language: "You become vested in your Executive Retirement Plan benefits after five years of service (including eligible vesting service earned prior to January 1, 2003)." So Wojcik seeks to use this extrinsic evidence to "in effect create a new contract." *Alexander v. Buckeye Pipe Line Co.*, 374 N.E.2d 146, 150 (Ohio 1978). Wojcik also cites a letter describing a later Masco Cabinetry supplemental plan for executives. But this letter suggests that this newer plan (like the Agreement) required executives to work for five years from the contract date before any benefits vested.

Indeed, other outside-the-contract evidence—that Rattray started with KraftMaid in 1996—cuts strongly the other way. Under Wojcik's reading, Rattray met the five-year requirement immediately on the contract date. Thus, even though the contract indicated that these

sizeable benefits were for "future" services, Rattray could have quit on the day after he signed the contract and still been entitled to receive them. As the district court recognized, his reading renders this requirement meaningless. And "if one construction of a doubtful condition written in a contract would render a clause meaningless and it is possible that another construction would give that same clause meaning and purpose, then the latter construction must prevail." *Sunoco, Inc. (R & M) v. Toledo Edison Co.*, 953 N.E.2d 285, 295 (Ohio 2011) (citation omitted). So Wojcik must rebut this extrinsic evidence with even more extrinsic evidence. He highlights Rattray's declaration opining that Masco used the same language for all four executives and that the company added this requirement because one of them (Donald Burgess) had yet to work for KraftMaid for five years in 2003. Rather than weigh this extrinsic-evidence point and counterpoint, Ohio law instructs us to follow the clear contractual language.

Procedurally, Wojcik's request violates the Federal Rules of Civil Procedure. Most of his extrinsic evidence is not only outside the contract, but also outside the complaint. He included all but the financial statements with a summary-judgment motion that was mooted when the district court granted the motion to dismiss. Contrary to Wojcik's claim, courts generally cannot consider evidence outside the complaint at this stage. *See Hensley Mfg. v. ProPride, Inc.*, 579 F.3d 603, 613 (6th Cir. 2009). His evidence confirms why this rule exists. His summary-judgment motion asserts facts that seemingly contradict his complaint. His motion, for example, says that the Agreement was signed on or about August 23, *2002*, not on or about August 23, *2003*. And the motion even attaches another copy of the Agreement that is identical to the copy attached to the complaint in all respects save that a "2" has been handwritten over the "3" in the places where the parties handwrote the contract date. Yet neither Wojcik's summary-judgment motion nor his

appellate brief acknowledges (let alone explains) this inconsistency. At this motion-to-dismiss stage, therefore, we consider only his complaint (and the version of the Agreement attached to it).

Wojcik lastly argues that the district court wrongly relied on summary-judgment cases and that "[a] contract should not be interpreted at [the motion-to-dismiss] stage." He is wrong. Whether a contract is unambiguous is a question of law that turns on a review of its language. *See Nationwide*, 652 N.E.2d at 686. Courts may undertake that review just as well at the motion-to-dismiss stage as at the summary-judgment stage. Like other courts, therefore, we have repeatedly affirmed decisions granting motions to dismiss on the ground that a contract was unambiguous. *See Watkins v. Honeywell Int'l Inc.*, 875 F.3d 321, 323–26 (6th Cir. 2017) (federal common law); *BKB Properties LLC, v. SunTrust Bank*, 453 F. App'x 582, 587 (6th Cir. 2011) (Tennessee law); *Nixon v. Wilmington Tr. Co.,* 543 F.3d 354, 357 (6th Cir. 2008) (Delaware law); *cf. Orchard Hill Master Fund Ltd. v. SBA Commc'ns Corp.*, 830 F.3d 152, 156–57 (2d Cir. 2016) (New York law); *McWane, Inc. v. Crow Chicago Indus., Inc.*, 224 F.3d 582, 584 (7th Cir. 2000) (Illinois law). Because we find this Agreement unambiguous too, Wojcik gives us no reason to depart from this procedural precedent.

In sum, the Agreement unambiguously required Rattray to work for KraftMaid for at least five years from the date it was signed. His complaint alleges that he did not do so. The district court thus properly granted Masco's motion to dismiss Wojcik's contract suit. We affirm.

**KAREN NELSON MOORE, Circuit Judge, dissenting.** This case involves a poorly written contract signed by two sophisticated parties. The question is whether the contract is ambiguous. In my view, the poor drafting resulted in ambiguity. The parties also present two reasonable, but competing, interpretations of the Agreement. Consequently, the consideration of extrinsic evidence is appropriate in this case, and I would reverse the district court.

Andrew Rattray and KraftMaid Cabinetry, Inc. entered into an agreement called the "Supplemental Pension Benefit Plan." R. 2 (Agreement at 26) (Page ID #50). The Agreement provides, "[i]f Executive shall remain in the Employment of the Corporation for at least five years, he shall be entitled to receive" a monthly retirement benefit. R. 2 (Agreement at 27) (Page ID #51). "Employment of the Corporation," in turn, is defined as "*any* service with any Masco Corporation company." R. 2 (Agreement at 26) (Page ID #50) (emphasis added). And "'[a]ny' means 'all.'" *Risner v. Ohio Dep't of Nat. Res., Ohio Div. of Wildlife*, 42 N.E.3d 718, 723 (Ohio 2015) (citing *Webster's Third New International Dictionary* 97 (2002)). Moreover, the Agreement was made "in consideration of services rendered *in the past* and rendered in the future . . . ." R. 2 (Agreement at 26) (Page ID #50) (emphasis added). The Agreement, therefore, contemplates a retirement benefit for all the work that an executive, here Rattray, has done.

The nub of this dispute is the phrase "shall remain," which appears in the retirement-benefit provision of the agreement. Two possible values could underlie that provision: one, the provision may reward an executive for having remained with the company since the start of their employment; or two, the provision may be an incentive to remain with the company for an additional specified period of time from the date of the contract. "Remain," of course, generally means "to stay in the same place or with the same person or group," or "to continue unchanged." *See Merriam Webster Online*, https://www.merriam-webster.com/dictionary/remain (last visited

12

Dec. 10, 2019). That general definition, however, does not answer the question of whether "remain" contemplates five additional years of service or five years from the start of employment. For example, one might say, "I remained at the company for five years before leaving for other opportunities." Or, "I would have remained at the company until I retired, if I had not been offered my dream job elsewhere."

The word "shall" does not answer our question either. According to the majority, the phrase "shall remain" "signal[s] that the contract imposes a forward-looking condition." Maj. Op. at 7. True, "shall" creates an obligation persisting into the future, but here, there is no defined starting-point. The contract equally could be read to create an obligation to remain in employment from the date employment began, as it could be read to create an obligation to remain in employment from the date the contract was signed. Both interpretations are reasonable. Looking at the contract as a whole, the majority points out that the Agreement defines "Employment of the Corporation" as "any service with any Masco Corporation company." In their view, that language contemplates a future contingency, in case Rattray changes jobs within the company down the line. But that language equally could contemplate job changes within the company prior to the date of the Agreement. A reading of the contract for its plain meaning simply cannot resolve the ambiguity in this case.

If there is ambiguity, the majority contends that its interpretation must prevail because it gives every provision purpose and effect. *See Sunoco, Inc. (R & M) v. Toledo Edison Co.*, 953 N.E.2d 285, 295 (Ohio 2011) ("[I]f one construction of a doubtful condition written in a contract would render a clause meaningless and it is possible that another construction would give that same clause meaning and purpose, then the latter construction must prevail.") (citation omitted)). That is not so. Contrary to the majority's view, using the start-of-employment date—so that

13

Rattray's rights would vest upon signing—would not render the five-year requirement meaningless. For one, the Agreement was made "in consideration of services rendered *in the past* and rendered in the future." R. 2 (Agreement at 26) (Page ID #50) (emphasis added). For another, the Agreement replaced a 1999 agreement, and Rattray started with the company in 1996. *See* R. 2 (Compl. at 21, ¶¶ 6, 10, 12) (Page ID #45). The fact that the 2003 Agreement replaced a prior one may well be extrinsic evidence, but that is precisely what we look to when the face of the contract does not tell us what we need to know.

Using the date-of-agreement, on the other hand, presents its own problems. The "Effective Date" of the Agreement is "the latter of" August 23, 2003 (the date that Rattray signed the contract) "or the issuance of [a] life insurance policy . . . ." R. 2 (Agreement at 26) (Page ID #50). In other words, Rattray could have worked four additional years, to 2007, and then the company could have issued a life insurance policy in 2007. Reading the contract pursuant to its definitions, that would mean that Rattray would need to work until 2012 to receive his retirement benefit. In short, the date of the contract—by its own terms—is a moving target and, in fact, unknown. If "remain" is taken to mean "remain from the date of the Agreement," the definition of "Effective Date" could lead to a seemingly absurd result. *Foster Wheeler Eniresponse, Inc. v. Franklin Cty. Convention Facilities Auth.*, 678 N.E.2d 519, 526 (Ohio 1997) ("'Common words appearing in a written instrument will be given their ordinary meaning unless manifest absurdity results, or unless some other meaning is clearly evidenced from the face or overall contents of the instrument.'" (quoting *Alexander v. Buckeye Pipe Line Co.*, 374 N.E.2d 146, 150 (Ohio 1978))).

Although we read contracts with an eye towards harmonizing the provisions, after attempting to harmonize the provisions of this contract, I conclude that it is ambiguous. The Agreement does not provide either "shall remain in the Employment of the Corporation for at least

14

five years *from the effective date of this Agreement*," or "*from the start of employment*." Looking to the plain meaning of "shall remain," and to the contract as a whole, does not resolve that ambiguity. The majority presents a reasonable reading, but there is another—that is, Rattray's. The district court should have allowed for the presentation of extrinsic evidence to resolve the ambiguities and to permit a choice between these competing reasonable interpretations.

For these reasons, I respectfully dissent.